UNITED STATES of America, Plaintiff–Appellee,

v.

Lilton CHESSON, Jr. and Randall Chesson, Defendants–Appellants.

No. 90–4416.

United States Court of Appeals, Fifth Circuit.

June 3, 1991.

Michael S. Fawer, Denise LeBoeuf, Dallas, Tex., for Lilton Chesson, Jr.

Thomas L. Lorenzi, Godwin, Roddy, Lorenzi, Watson & Sanchez, Lake Charles, La., for Randall Chesson.

William J. Flanagan, First Asst. U.S. Atty., Joseph S. Cage, Jr., U.S. Atty., Shreveport, La., for U.S.

Before GOLDBERG, HIGGINBOTHAM, JONES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Lilton Chesson, Jr. and his brother, Randall Chesson, appeal their convictions on three counts of tax evasion, 26 U.S.C. § 7201, and one count of conspiracy to obstruct the tax collecting function of the Internal Revenue Service, 18 U.S.C. § 371. At trial the prosecutor argued to the jury that the Chessons channeled through their privately-held companies various personal and church-related expenditures and that in

the years 1981 through 1983 they filed corporate and personal tax returns treating such non-corporate expenditures as deductible business expenses. On appeal the Chessons argue that the government failed to adduce sufficient evidence of willfulness. They contend that it was never shown that they attempted in any manner to conceal the fact that the corporations were paying these non-business expenses; to whatever extent they knowingly allowed the corporations to bear these expenses, they argue that they were reasonably relying upon their accountants to correct any errors in classification. Relatedly, the Chessons dispute the existence of a tax deficiency. They contend that had the accountants performed as reasonably expected, there would have been no additional tax obligation. We affirm.

## I.

Lilton Chesson, Sr. founded Chesson Oil Corporation in 1970. In 1974 Lilton Chesson, Jr. took over active control of the business and, in the same year, formed Cameron Offshore Services, a sister company. Both companies were closely-held corporations engaged in the oil and gas production and marketing business. Lilton Chesson was the chief executive officer of the related companies in the years in issue. Between them, Lilton Chesson and his brother Randall were the companies' sole shareholders. Randall assisted Lilton in managing the affairs of the family businesses, though as of 1975 Randall was also the full-time pastor of Parkview Baptist Church.

Gladys Harbour was the office manager and ranking administrative employee for Chesson Oil and Cameron Offshore Services. The field supervisors of the various company terminals, as well as the head of the accounting department, Kathy Baham, reported directly to Harbour, or to Lilton or Randall Chesson.

The companies shared one accounting department, although different employees worked exclusively for and were paid by one or the other of the corporations. The companies needed a relatively large accounting staff because they handled a large volume of discrete purchase and sale transactions. It was the job of the accounting staff to keep close track of accounts payable and receivable. In the years at issue the companies processed as many as 10,000 invoices for purchases per year. Files were kept by vendor of all accounts payable. Invoices received in the main office would be stamped with a processing block with all information needed for payment. This information included: (1) the company to be billed—either Chesson Oil, Cameron Offshore, or one of their subsidiaries; (2) the terminal involved; (3) the date; (4) the account code number; (5) the approving authority; and (6) a description of the item or services purchased.

Invoices would be coded by company in the accounting department and then sent out to the appropriate terminal for approval. Lilton and Randall Chesson and Gladys Harbour had the authority to approve invoices in the main office, and each field supervisor had authority to approve invoices at the terminals. Once they were approved and a description of the services entered, the invoices would be sent back to the accounting department. There they would be coded, journalized, and set up for payment. Coding decisions were usually made by the accounts payable supervisors. When they had questions they would go to Kathy Baham, who in turn directed her questions to Gladys Harbour or either of the Chessons.

Because of the potential for confusion of overlapping corporate entities, Gladys Harbour directed the accounting personnel to be vigilant to ensure that all invoices were charged to the correct corporate entity and that the invoices so indicated. In the earlier years invoices addressed to the wrong entity would be returned to the vendor with instructions to create a new, corrected invoice. As the company grew it became apparent that these procedures could no longer assure prompt payment on all accounts payable. Thus, at the direction of Lilton Chesson, Gladys Harbour instructed the accounting staff to make the necessary modifications of invoices internally. Every

paid invoice, with the check stub, was filed according to vendor.

At least from 1981 through 1983, the corporations paid a wide variety of Lilton's and Randall's personal expenses. These expenses included personal travel, vehicle repair, sporting goods, home maintenance and improvements, home furniture, electronic equipment, legal fees, jewelry, as well as other personal items billed to their corporate American Express cards. The accounting department knew that the corporation was paying these personal expenses. Such invoices, many patently relating to personal items, were routinely processed and paid in the same manner as legitimate business expenses. The invoices were also filed in the same way, by vendor, and clearly labelled.

All work done on Lilton's or Randall's personal residences was supervised by Rodney Guidroz, the field supervisor of the Chloe terminal. When an invoice for such work came to the company it was sent to Guidroz for approval. In filling out the processing stamp Guidroz would normally put the initials "LC" or "RC" in the space allotted for description of the purchase. This was Guidroz's code for work done at either Lilton's or Randall's home. Occasionally, invoices for personal items would be sent to Randall or Lilton at their homes. As a matter of routine, the accounting department would change the addressee on these invoices in the same way it changed invoices addressed to the wrong corporate entity. Each of the Chesson employees who testified denied ever being told to conceal the fact that the corporation was paying for personal items and services for Lilton and Randall Chesson.

In 1980 Parkview Baptist Church began to renovate and reconstruct the church and its school. The contributions of church members to the building fund were modest compared to the cost of the project. But it was understood by the church that Randall and Lilton would supplement the building fund as necessary. From 1981 through 1983 the Chessons through their corporations paid nearly $700,000 in project costs.

These payments were treated by the Chessons and the church as a gift.

It was also common knowledge among Chesson employees that the company was paying for the construction of the new church and school. Lilton Chesson met with Rodney Guidroz and David Stayshich, a staff engineer, and informed them that this venture would be undertaken, in part, by company employees and paid for, in whole, by company funds. The new church structures were designed by Stayshich. Rodney Guidroz functioned as the general contractor for the project. He and his subordinates did much of the carpentry work but they also subcontracted certain specialized jobs. Lilton told Guidroz to charge the company for these outside costs and, for accounting purposes, to use the designation "R & M," indicating the repairs and maintenance account, on all invoices. At a later date Lilton directed Guidroz to begin billing church construction costs to Cameron Offshore instead of Chesson Oil.

Again, invoices were sometimes addressed to the Parkview Baptist Church. As with the other invoices, these would be changed to conform the addressee to the paying entity. Even after these changes, many invoices plainly related to work done for the church. Several invoices mentioned the name of the church in the description. Some also contained words evidencing that they were church-related expenses—words such as "sanctuary," "alter," or "pew." While addressee changes to these invoices were routinely made, the description sections of several were also found to have been changed. These changes included obliterations of the name of the church or other church-related references. None of the Chesson employees that testified admitted knowledge of such changes. All of the employees that testified denied ever being told by Randall or Lilton Chesson to conceal the fact that the company was making these expenditures on behalf of the church.

In early 1980, the IRS audited the 1978 corporate tax return of Chesson Oil Corporation. This was a routine civil audit, but it did result in certain disallowances. Phyllis Hodgkins, the revenue agent who con-

ducted the audit, found in the corporation's books certain improper church-related expenses as well as personal expenses for both Randall and Lilton Chesson. Agent Hodgkins reclassified the personal items as additional compensation to Randall and Lilton, creating additional tax obligations for each of them. The church-related expenditures, on the other hand, she simply reclassified as corporate charitable contributions, creating no additional tax obligations for the corporation. Agent Hodgkins then discussed the disallowances with Randall and Lilton individually and obtained their signatures on an agreement to assume the additional tax liabilities.

During the years in issue the corporations retained two different accounting firms to develop year-end financial statements and to render unqualified opinions as to their material accuracy. The firms sent a team of auditors to the corporate headquarters. The auditors dealt primarily with Kathy Baham, but they had access to all corporate financial records, including all paid invoices. Neither firm had any significant contact with Lilton or Randall Chesson. Though neither accounting firm discovered a single invoice involving non-corporate expenditures, there is no dispute that in the three years at issue the corporations paid personal expenses in excess of $285,000 and church-related expenses of over $300,000. In the same period approximately 700 invoices involving non-corporate expenses were processed through the companies.

The IRS began an audit of the 1981 Chesson Oil Corporation tax return in May 1984. Later, the audit was expanded to include the returns of Cameron Offshore Services and both Lilton and Randall Chesson and was extended to each of the years 1981 through 1983. Robert Holland was the revenue agent initially assigned to the audit. Within the first thirty days Agent Holland questioned several corporate expenses. He first approached Kathy Baham, but was then directed to Lilton Chesson.

Holland testified at trial that Lilton Chesson lied when they first discussed the invoices. When asked about one invoice designated as an "R & M" expense out of the Chloe terminal, Lilton reportedly stated that it involved some "company property." Yet this particular invoice was later identified by Rodney Guidroz as involving work performed at the Parkview Baptist Church. When Holland asked Lilton about a $10,000 invoice from a travel agency directed to "Mrs. Randall Chesson," Lilton identified the invoice as covering the costs of a church trip to Biloxi, Mississippi. Other invoices questioned by Holland in this first meeting with Lilton Chesson included construction and materials for a fence around his home. Lilton argued that this was a valid business expense, necessitated by threats to his family's security by unruly employees. Another invoice was for legal fees paid by Lilton Chesson in defense of a restrictive covenant suit arising out of the construction of the fence. This, too, Lilton argued was a legitimate business expense.

After this meeting, convinced that the corporate books contained both church-related expenses and what appeared to be personal expenses, Agent Holland referred the case for criminal prosecution. Special Agent Mark Kroczynski conducted the criminal investigation. The investigation spanned several years, culminating in Kroczynski's recommendation that both Randall and Lilton Chesson be prosecuted for tax evasion and conspiracy.

Several Chesson employees testified at trial. Though each testified to personal knowledge of the extensive practice of corporate payment of personal and church-related items, all denied being asked to conceal this fact. The testimony of Kathy Baham is particularly noteworthy. Unexplainably, she denied knowing anything of the non-corporate expenses that were being passed through the companies' books. More importantly, though, Baham testified concerning a conversation she had with Randall Chesson following her plea of the privilege against self-incrimination before the grand jury. According to Baham, Randall Chesson came to speak with her at that time, upset that she had pled the Fifth Amendment. She insists that he told her: "Put the blame on me, I told you to alter

the invoices, I told you to code them, the most I'll get is community service."

The prosecution placed great emphasis on this testimony, depicting Randall's statement as an admission of guilty knowledge. But Government Exhibit 32–416(b) was even more important to the prosecution's case. This exhibit was one of several invoices originally addressed to the Parkview Baptist Church from Chaisson Electric Company for work performed at the church. This invoice was significant because allegedly attached to the original was a self-adhesive note, a "post-it," that read, "Sara Brou—please send me the original and all the other copies of this invoice that you have. LC." Also, there was a copy of the same invoice with the words "Parkview Baptist Church" obliterated that had a second post-it attached to it with the words, "Sarah, the attached is to replace the one you sent me, please discard all other copies you presently have and use these in its place. LC."

Sarah Broussard was the only Sarah that worked in the corporations' accounting department. She supervised accounts payable exclusively for Cameron Offshore. Sarah Broussard testified, out of the jury's presence, that the handwriting appeared to be Lilton Chesson's, but she insisted that she had never seen the invoice or the post-its. Based on her testimony, and the fact that the invoice was one paid by Chesson Oil, not Cameron Offshore, the district court initially excluded this invoice and the post-its from evidence. However, the court later reversed its ruling after hearing the testimony of Agent Kroczynski, who maintained that he specifically remembered seeing the post-its affixed to the particular Chaisson Electric invoice when he culled the Chaisson invoices in preparation for an interview with the company's owner, Bart Chaisson.

## II.

The Chessons argue on appeal that the evidence produced at trial was not sufficient to sustain their convictions for tax evasion and conspiracy. Though they readily admit that they used significant amounts of company funds to pay personal and church-related expenses in the years in question, they steadfastly deny that they ever intended, much less conspired, to evade taxes. According to the Chessons, the funds expended by the corporations on their personal behalfs were intended as loans to them as shareholders; the church-related expenses, on the other hand, were intended as corporate charitable contributions. The error, they contend, was one of classification. And this error was committed by their accountants, not themselves. The Chessons argue that their accountants were negligent in not discovering and reclassifying these various non-corporate expenses. Had the auditors done their job, the argument continues, the expenses would have been properly reclassified and there would have been absolutely no tax impact, either for them personally or for the corporations.

In weighing the sufficiency of the evidence, we must view the evidence in the light most favorable to the government, accepting all reasonable inferences and credibility choices that support the jury's verdict. *United States v. Gonzales,* 866 F.2d 781, 783 (5th Cir.), *cert. denied,* 490 U.S. 1093, 109 S.Ct. 2438, 104 L.Ed.2d 994 (1989). A jury is free to choose among reasonable constructions of the evidence. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). We may reverse only if a rationally-minded trier of fact would necessarily have entertained a reasonable doubt as to the existence of any essential element of the charged offense. *United States v. Nixon,* 816 F.2d 1022, 1029 (5th Cir.1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988). After a thorough review of the record, we are persuaded that the convictions must stand.

## A.

Any person who "willfully attempts in any manner to evade or defeat any tax" imposed by the Internal Revenue Code is guilty of a violation of 26 U.S.C. § 7201. The elements of a § 7201 offense are will-

fulness, a tax deficiency, and an affirmative act of evasion or attempted evasion of the tax. *United States v. Kim,* 884 F.2d 189, 192 n. 1 (5th Cir.1989) (citing *Sansone v. United States,* 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965)). The government must prove "every element beyond a reasonable doubt though not to a mathematical certainty." *Holland v. United States,* 348 U.S. 121, 138, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954).

The Chessons argue that the government failed to adduce sufficient evidence of willfulness. They contend that it was never shown that they attempted in any manner to conceal the fact that the corporations paid non-business expenses. To whatever extent they knowingly allowed the corporations to bear these expenses, they argue that they were reasonably relying upon their accountants to correct any errors in classification. The Chessons also dispute the existence of a tax deficiency. Had the accountants performed as reasonably expected, they argue, there would have been no tax due and owing.

### 1.

■ Willful tax evasion is "a voluntary intentional violation of a known legal duty." *United States v. Smith,* 890 F.2d 711, 715 (5th Cir.1989). Evidence of willfulness is ordinarily circumstantial. *Kim,* 884 F.2d at 192. It may consist of, among other things, "a failure to report a substantial amount of income, a consistent pattern of underreporting large amounts of income, the spending of large amounts of cash that cannot be reconciled with the amount of reported income, or *'any conduct, the likely effect of which would be to mislead or to conceal.'*" *Id.* (citations omitted) (emphasis added).

■ The jury could reasonably have concluded that the Chessons pursued a consistent practice of underreporting personal taxable income and abusing the corporate entity of their companies despite a prior audit in which the IRS found the Chessons to have mischaracterized personal and church-related expenditures as deductible business expenses. In the years 1981 through 1983 the Chessons charged personal expenses to the companies' accounts of approximately $600,000. No single unequivocal instance of concealment was proved. Nonetheless, the jury could have concluded that the manner in which the Chesson companies dealt with invoices for non-corporate expenses was misleading or concealing. *See Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943); *Kim,* 884 F.2d at 192. The methods of coding invoices, of obliterating and altering addresses and purchase descriptions, and of destroying certain original invoices all combined to reduce the likelihood of random detection of the improper expenses, or so a jury could conclude. Alone this inference would be thin indeed, but the Chessons' decision to condone these practices shortly after undergoing a civil tax audit for underreporting income puts them in a different light. While yet not compelling, we cannot say that the evidence will not permit an inference of willful criminal conduct.

The jury could also have relied on other testimony in determining that Randall and Lilton Chesson willfully evaded taxes. Agent Holland testified that Lilton Chesson mischaracterized the nature of various invoices when questioned directly. This testimony was corroborated by other witnesses, including Rodney Guidroz, who testified that all "R & M" expenses out of the Chloe terminal involved work done at Parkview Baptist Church and that Lilton directed him to use the R & M account. Kathy Baham testified that Randall Chesson told her to blame him for the way in which the company treated the suspect expenses. In his own words, he had been the one who told her to change and code the invoices, and the most he would have to do was community service.

Finally, the jury could have drawn an inference of willfulness from the altered Chaisson Electric invoice and the post-its attached to it and the original invoice; the jury could have inferred that Lilton Chesson was ordering a Chesson employee to alter and discard documents that might evidence company payment for the benefit of

Parkview Baptist Church. The testimony of Sarah Broussard, and the obvious risk that the post-its may not have been attached to these actual invoices, weakens the probative value of this evidence. That we would not draw the inference is of no moment. It was for the jury. Our task is only to decide if the agreed inferences are beyond the pale of rational inference. That question must be answered in favor of the government.

The Chessons argue that whatever proof of willfulness is contained in the record is undermined by proof that they relied in good faith upon their accountants to discover and reclassify any improper expenditures. At trial the Chessons called Greg Hext, an accountant, as an expert witness. Hext expressed the opinion that the internal audits by both accounting firms were substandard, inadequate, and professionally irresponsible. He drew attention to what he termed "red flags"—circumstances that should have raised serious concerns in the minds of the auditors, prompting direct inquiries aimed at discovering improper expenses in the companies' books. The prior audit and resulting disallowances were enough in themselves, he asserted, to justify pointed questioning of both Randall and Lilton Chesson. Hext also stated that any accountant should know that certain company accounts are likely to mix personal items with legitimate business expenses, especially in a closely-held corporation. There were also simple and direct signals from the numbers. The ratio of yearly expenses in repairs and maintenance to company assets was a plain signal, according to Hext. Hext testified that in one year this ratio exceeded 1:3. Finally, the company kept vendor files for firms dealing in such things as men's clothing, Christian books, sporting goods, and pool cleaning.

■ The Chessons point to *United States v. Venditti*, 533 F.2d 217, 219 (5th Cir.), *reh'g denied*, 540 F.2d 1086 (1976). *Venditti* holds, however, that even good faith reliance on one's accountant is not a complete defense to willful tax evasion. *Id.* The force of the defense as an abstract proposition aside, the jury was entitled to conclude that the Chessons' reliance upon their accountants to discover and reclassify the impermissible expenses was not in good faith—that they knowingly, or recklessly, withheld from their accountants information concerning the more than 700 improper invoices at issue in this case, comprising nearly $600,000 in personal and church-related expenses. It is true that the accountants' conduct looks like deliberate ignorance but even if they never asked the Chessons whether such expenses were in the books the Chessons have no safe harbor. As we held in *Venditti*, where a defendant attributes underpayment of taxes to his accountant's failure to discover and rectify improper expenses, the question of willfulness is not removed from jury consideration. *Id.*

2.

The Chessons also contend that there is insufficient evidence of a tax deficiency. Their argument is that, had the accountants properly audited the corporation, these personal and church-related expenses would have been reclassified with no resulting tax impact for the companies or the Chessons.

There was a great deal of testimony as to the proper timing and method of reclassifying non-business expenses. Most of the testimony confirmed that a corporation's accountants can, and should, reclassify personal and other non-business expenses at the end of the tax year to minimize the client's tax obligations. There are several options. A personal expense may be reclassified as additional compensation to the shareholder, as a loan payable by the shareholder, or as a constructive dividend to the shareholder. The Chessons contend that the personal expenses at issue here could have, if discovered by the accountants, been reclassified as loans payable, resulting in no additional tax obligations. They point out that the corporate ledgers had accounts for shareholder loans, and that at various times in the past there were such loans, as well as loans from the Chessons to the corporations. In recommending this case for criminal prosecution, however,

Agent Holland classified these personal expenses as constructive dividends.

With respect to reclassification of the church-related expenses, the testimony at trial confirmed that an accountant could have reclassified these expenses as corporate charitable contributions up to the limit of five percent of the corporations' income. In 1982 the allowable contribution was raised to ten percent. And though a corporation's charitable contributions in a given year are capped, contributions in excess of this ceiling may be carried over to later years. The accountants might also have been able to treat these expenses as additional compensation to the Chessons, who in turn could claim the expenses as personal charitable contributions. One benefit of this treatment is that individuals can contribute up to fifty percent of their income to charity. Had either of these things been done, before filing, there would have been no tax impact for the corporations or either of the Chessons.

This is where the testimony diverged. The inescapable fact is that none of the questioned expenses was reclassified before filing in any of the relevant years; these expenses were treated in the companies' books and tax returns as deductible operating costs. Contrary to much of what the defendants have argued, the IRS is not at liberty to retroactively reclassify disallowable business expenses. Without evidence that the Chessons intended to take loans from the corporations, the IRS must view personal expenses made by the companies for their benefit as taxable shareholder income.

To prove a tax deficiency, "the government must show that the taxpayer had unreported income, and second, that the income was taxable." *United States v. Fogg*, 652 F.2d 551, 555 (5th Cir.1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1751, 72 L.Ed.2d 162 (1982). There can be no question that the government did that in this case: "full and proper returns would have resulted in larger tax obligations than those shown in the returns actually filed." *Jones v. United States*, 282 F.2d 745, 747 (4th Cir.1960), *cert. denied*, 365 U.S. 842, 81 S.Ct. 799, 5 L.Ed.2d 808 (1961). This case would be different if the evidence inevitably pointed to the conclusions that the personal expenditures involved were intended as loans and the church-related expenditure, above the allowable ceiling, were intended as additional compensation. In that event, "full and proper" returns might not create additional tax liabilities.

We are persuaded that the evidence produced at trial was sufficient to support the jury's verdicts of guilty beyond a reasonable doubt to the charges of willful tax evasion.

### B.

Sufficient evidence also existed to support the Chessons' convictions for conspiracy. To sustain a conspiracy conviction under 18 U.S.C. § 371 the government has the burden of proving beyond a reasonable doubt that the alleged conspirators agreed among themselves to defraud the United States by obstructing the tax collecting function of the IRS. *United States v. Ortiz–Loya*, 777 F.2d 973, 981 (5th Cir.1985). The government also has the burden of proving at least one overt act in furtherance of this agreement. *Id.* Participation in a conspiracy need not be proved by direct evidence; "a common purpose and plan may be inferred from a 'development and collection of circumstances.'" *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

Viewing the evidence in the light most favorable to the verdict, we must conclude that there was sufficient evidence that the Chessons conspired as charged. The jury could reasonably have concluded that Randall and Lilton Chesson agreed to divert substantial resources from the Chesson companies to the construction of Parkview Baptist Church, that they agreed to use Chesson employees for the project, and that they agreed to charge the outside costs as a legitimate business expense to the companies' repairs and maintenance accounts. With respect to the personal expenditures made by the companies on behalf of the Chessons, the evidence showed

that Randall and Lilton Chesson acted in common, that they agreed to charge personal items to the company, that they agreed to use company employees to perform work on their private residences, and that they agreed to treat these expenditures as corporate expenses, not taxable shareholder income.

### III.

 We are left only with the question whether the district court erred in admitting into evidence Government Exhibit 32–416(b), copies of a certain Chaisson Electric invoice with post-its attached. The issue is important, as made plain by our earlier discussion. The Chessons argue that this exhibit was never adequately authenticated. Because of the tendency of post-its to randomly disattach and reattach themselves, they argue, the court could not with confidence have found that this exhibit was in fact what the government claimed it to be—that is, evidence that Lilton Chesson deliberately ordered a subordinate to alter company invoices concerning work performed at Parkview Baptist Church.

In judging the admissibility of this invoice, the court heard testimony from Agent Kroczynski, who maintained that he remembered seeing these notes affixed to these specific invoices when he sorted through the Chaisson Electric bills as part of his pre-indictment investigation of this case. From the papers before us we are dubious. But a proper answer to this question, dependent as it is on context, requires that we remain sensitive to our constitutional role. This is the domain of the trial judge, as reflected by his considerable discretion in making such rulings. We cannot say that the district court was outside the wide reach of its discretion in admitting these items to evidence.

AFFIRMED.