IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 00-20282

———————————————

UNITED STATES OF AMERICA

Plaintiff-Appellee

-vs-

GEORGE MEREDITH BISHOP, III

Defendant-Appellant

————————————————————————————

Appeals from the United States District Court
for the Southern District of Texas

————————————————————————————

August 29, 2001

Before HIGGINBOTHAM and BENAVIDES, Circuit Judges, and LITTLE, District Judge.[*]

LITTLE, District Judge:

Today we consider George M. Bishop III's appeal of three convictions centered upon income

tax and reporting violations. The first and third counts involve attempted tax evasion,[1] in the 1991

———————————————

[*]Chief Judge F.A. Little, Jr. of the Western District of Louisiana, sitting by designation.

[1]26 U.S.C. § 7201.

and 1994 tax years, respectively. The second count relates to knowingly filing a false income tax return, under penalty of perjury, for 1991.[2] Finding no reversible error, we affirm each conviction.

I.

The operative facts are not in serious dispute. During all times material to counts one, two and three, Bishop was the sole proprietor of George M. Bishop and Associates (GMBA), a law firm in Houston, Texas. In 1994, the Internal Revenue Service (IRS) initiated an audit of Bishop's account, because he did not file federal income tax returns for the years 1989, 1990, and 1991. Bishop explained the delay was caused by tensions in his marriage, leading to his divorce in 1991. Under the pressure of the audit and with the assistance of his accountants, Bishop filed the missing returns in August 1994, September 1994, and December 1994, respectively.

The audit continued because IRS employees suspected Bishop understated his income. In September 1995, Mark E. Locus, the IRS agent in charge of the case, received an anonymous letter suggesting that Bishop omitted a substantial fee he received in April 1991 from Harold Scharold, a client in a breach of contract suit. A review of Bishop's records showed that, on 5 April 1991, Scharold paid a $933,333.33 legal fee. The check was payable to GMBA, but was deposited in Bishop's personal account at Dean Witter. Joye Wilson, Bishop's bookkeeper, initially recorded the amount as fee income in the GMBA general ledger, in accordance with the normal office procedure. At Bishop's instruction, Wilson reversed the first ledger entry by debiting the account. GMBA's monthly profit and loss statements therefore did not reflect receipt of the fee.

Bishop did not report the fee either. His 1991 tax return stated that his gross income from the practice of law was $988,599.00. IRS agent Kay Campbell, Locus' successor, determined that

_____

[2]26 U.S.C. § 7206.

at most, Bishop reported $352,945.81 out of the $933,333.33 fee he received from Scharold. The $352,945.81 included $140,000 which is the sum Bishop paid to his ex-wife and advised his accountant to add to his reported income, and $212,945.89 that Campbell could not attribute to other sources. Campbell also found that Bishop may have failed to report other income of $150,344.77, the total of amounts added to the GMBA general ledger during the last four months of the year but not included on Bishop's return.

Additionally, in August 1991, Bishop received a $183,666.67 fee plus $28,513.42 in litigation expenses, for representing the Cash children in a legal malpractice suit. Both sums were paid into Bishop's trust account. Bishop should have reported the $183,666.67 as income. During the week after receiving the money, however, he withdrew $111,120.59 from the trust account and deposited it in two personal accounts. He did not report any portion of this money as income. Accordingly, his total unreported income for 1991 was at least $841,822.80. Campbell recalculated Bishop's taxes for the year, making appropriate adjustments in Bishop's favor as well as adding the unreported income. Bishop's return reported a tax of $107,973.00, but according to Campbell, he actually owed $358,002.00. There was an underpayment in excess of $250,000.[3]

Campbell also reviewed Bishop's return and records for 1994. Bishop filed his 1994 return in April 1995, reporting gross income from the practice of law of $676,262. In a matter settled during the year, Bishop received a $575,000 fee. One of the opposing lawyers paid Bishop a $400,000 portion of the fee. Bishop requested that the lawyer wire transfer the money to Bishop's personal account at Chappell Hill Bank. The lawyer refused to wire transfer the money, but did send the check directly to Chappell Hill Bank. Consequently, the payment was not recorded in the GMBA

---

[3]This figure includes $10,247.00 in self employment tax. The rest is income tax.

3

general ledger. Upon receipt of a Form 1099 regarding the $400,000 payment, Pat Schulmeier, Bishop's new bookkeeper, informed Bishop's accountant of receipt of only $196,006.74 out of the $400,000, for reasons that remain unclear.[4] A $10,000 check, which was a part of the $575,000 fee but from a different source, also was deposited at Chappell Hill Bank and omitted from Bishop's return. As a result, Bishop failed to report $179,532.41 to $213,993.26 of fee income received in 1994.[5]

In October 1996, Bishop amended his 1994 return in an attempt to correct the problem, increasing his gross income from the practice of law by $400,000, resulting in a total of $1,076,262. He also adjusted his deductions, and paid appropriate additional taxes. Later, Bishop discovered that $196,006.74 of the $400,000 had in fact been included in the initial return and filed a second amended return in July 1998. Now Bishop's reported gross income from the practice of law was $890,255.[6]

In light of Campbell's findings, and Bishop's efforts to conceal his income and spending habits from IRS agents and his own accountants, a fraud investigation and criminal prosecution began. On 24 March 1999, a grand jury returned a three count indictment against Bishop. After a seventeen day trial, the jury convicted Bishop on all three counts. Subsequently, Bishop discovered that one of the jurors, Jodi Tharp, had been less than candid concerning her prior experiences with the law. Specifically, Tharp was charged with third degree felony embezzlement in 1997. Over the course of eight months, Tharp stole $42,250 from the bank where she worked. She pled guilty in Texas state

---

[4]$196,006.74 may have been the portion of the $400,000 remaining after Bishop repaid a loan and sent $100,000 to his ex-wife.

[5]The checks for the remaining portion of the $575,000 fee were reported properly. Campbell could not determine the source of $34,460.85 of Bishop's reported 1994 income. Accordingly, there is a slight possibility that the amount was attributable to the two checks deposited at Chappell Hill Bank.

[6]Apparently no adjustment was made with regard to the omitted $10,000 check.

4

court, and adjudication of the matter was deferred for ten years. At the time of Bishop's trial, she was paying a fine and restitution in installments, and was under community supervision, which is equivalent to probation.

On a juror questionnaire, Tharp responded "no" to the questions "Have you ever been convicted of a state or federal crime punishable by imprisonment for more than one year?" and "Have you ever been charged criminally other than with a traffic ticket?" During voir dire, she did not raise her hand in response to several questions as to whether she had ever been involved in a criminal matter, as an accused, witness, or victim. Nor did she respond when the judge gave the jurors an opportunity to raise their hands if they had anything to add regarding the previous questions.

After Tharp's criminal history was revealed, Bishop moved for a new trial. The district court held an evidentiary hearing and determined that Tharp was statutorily disqualified from serving on a jury, but denied Bishop's motion because he failed to demonstrate that Tharp was biased and that he suffered as a result of that bias. Bishop appeals this ruling and asserts that the district court made several other reversible errors before, during, and after the trial. We address each point raised, some in more detail than others.

II.

Bishop contends that counts one and three of the indictment are defective because they omit the tax deficiency and knowledge elements of tax evasion, and that count two contains no allegation he acted willfully in filing a false return. An indictment must allege each element of the charged offense, in order to insure that the grand jury finds probable cause that the defendant committed each element, to prevent double jeopardy, and to provide notice to the accused. *See United States v.*

5

*Cabrera-Teran*, 168 F.3d 141, 143 & n.5 (5th Cir. 1999).  We consider the sufficiency of the indictment de novo.  *See id.* at 143.

A.

The crime of tax evasion as defined in 26 U.S.C. § 7201 has three essential elements:  (1) the existence of a tax deficiency; (2) willfulness; and (3) an affirmative act constituting evasion or attempted evasion of the tax.  *See United States v. Townsend*, 31 F.3d 262, 266 (5th Cir. 1994) (citing *Sansone v. United States*, 380 U.S. 343, 351, 85 S. Ct. 1004, 1010, 13 L. Ed. 2d 882, 888 (1965)).

After describing the results of the audit in detail, count one of the indictment boldly alleges the following:

> [Bishop] did knowingly and willfully attempt to evade and defeat a substantial income tax due and owing by him. . . by:  failing to timely file an income tax return on or about October 15, 1992, causing false and misleading books and records to be created, providing incomplete or misleading information to his tax preparer, concealing information likely to alert the IRS Revenue Agents to unreported income, and other affirmative acts of evasion.

Count three describes the misreporting of the fees deposited at the Chappell Hill Bank and states that Bishop "did willfully attempt to evade and defeat a substantial income tax due and owing by him. . . by preparing and causing to be prepared, and by signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return–Form 1040."

Both count one and count three explicitly charge that a tax deficiency existed, that Bishop's acts were willful, and that he committed affirmative acts constituting evasion or attempted evasion. All elements were presented to the grand jury.  Bishop argues that the indictment fails to acknowledge certain items that would offset any deficiency.  This argument has no merit.  The non-

6

existence of credits, refunds, and other payments may affect the extent of any deficiency, but is not a specific element of tax evasion. There is no need to list each potentially offsetting item in the indictment. Counts one and three throughly describe the omission of large fees received in 1991 and 1994, respectively, the filing of the returns, and the related investigation. There is no question as to the nature of the charges. Counts one and three are legally sufficient.

B.

A person commits the felony of filing a false tax return in violation of 26 U.S.C. § 7206(1) when he "willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1). Count two of the indictment reads as follows:

> [Bishop] did willfully make and subscribe a United States Individual Income Tax Return–Form 1040, which was verified by a written declaration that it was made under the penalties of perjury and was filed with a Revenue Agent. . . which 1991 income tax return [Bishop] did not believe to be true and correct as to every material matter in that the said federal income tax return reported Schedule C Gross Receipts of $988,599.00, whereas, [Bishop] then and there well knew and believed, that [Bishop's] 1991 Schedule C Gross Receipts were false, that is, that the Schedule C Gross Receipts were actually in excess of $1.5 million during 1991.

Bishop was charged with "willfully" filing a tax return that he "believed" to be "false." The indictment not only tracked the language of the statute, but also explicitly stated that Bishop knew the return was false but nonetheless chose to file it. Count two specifies that Bishop's Schedule C gross receipts for 1991 were understated, and additional discussion of the 1991 return appears in other portions of the indictment. No element of the crime was omitted. Count two of the indictment is also legally sufficient.

7

III.

Bishop challenges several of the district court's evidentiary rulings. We review these for abuse of discretion but affirm so long as any error is harmless. *See United States v. Taylor*, 210 F.3d 311, 314 (5th Cir. 2000); *United States v. Skipper*, 74 F.3d 608, 612 (5th Cir. 1996). In order to obtain a reversal, the complaining party must demonstrate that the district court's ruling caused him substantial prejudice. *See United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999).

A.

Both the government and the defendant introduced summary evidence. Bishop argues that Robert Simpson, an IRS agent who acted solely as the government's summary witness and not as an expert, testified to matters of which he had no personal knowledge, testified to the contents of letters that were hearsay, and gave his opinion on a variety of issues. Bishop also contends that the district court should not have admitted charts summarizing and clarifying the government witnesses' analysis, because the documents were misleading and confusing, and were not tempered by appropriate jury instructions.

The use of summary testimony and documents is governed by Rule 1006 of the Federal Rules of Evidence, which is broadly interpreted. *See Taylor*, 210 F.3d at 315; *United States v. Winn*, 948 F.2d 145, 158 (5th Cir. 1991). Rule 1006 allows admission of summaries when (1) the evidence previously admitted is voluminous, and (2) review by the jury would be inconvenient. *See Taylor*, 210 F.3d at 315; *United States v. Stephens*, 779 F.2d 232, 239 (5th Cir. 1985). A summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case. *See Flemister v. United States*, 260 F.2d 513, 517 (5th Cir. 1958).

8

Summary evidence must have an adequate foundation in evidence that is already admitted, and should be accompanied by a cautionary jury instruction. *See United States v. Means*, 695 F.2d 811, 817 (5th Cir. 1983). Full cross-examination and admonitions to the jury minimize the risk of prejudice. *See United States v. Castillo*, 77 F.3d 1480, 1500 (5th Cir. 1996); *United States v. Jennings*, 742 F.2d 436, 442 (5th Cir. 1984). We previously approved a cautionary instruction that "summaries do not, of themselves, constitute evidence in the case but only purport to summarize the documented and detailed evidence already submitted," and an instruction that a witness's summary "is not the evidence, the evidence is the documents themselves that he has been referring to." *United States v. Lavergne*, 805 F.2d 517, 521-22 (5th Cir. 1986) (quoting *United States v. Diez*, 515 F.2d 892, 905 (5th Cir. 1975)).

Summary charts in particular are admissible when (1) they are based on competent evidence already before the jury, (2) the primary evidence used to construct the charts is available to the other side for comparison so that the correctness of the summary may be tested, (3) the chart preparer is available for cross-examination, and (4) the jury is properly instructed concerning use of the charts. *See United States v. Goodwin*, 470 F.2d 893, 899 (5th Cir. 1972); *McDonnell v. United States*, 343 F.2d 785, 789 (5th Cir. 1965). Summaries may accompany the jury to the jury room. *See Winn*, 948 F.2d at 158-59.

We first note that it was appropriate to use summary evidence in this case. The trial consumed seventeen days of technical testimony and scores of exhibits were presented. Bishop argues that Simpson, a summary witness, testified to matters beyond the scope of a summary, but the government correctly explains that the bulk of Simpson's testimony was a recitation of facts already in the record. An exception is Simpson's expression of the opinion that several people harbored ill

9

will toward Bishop, but this comment was a response to Bishop's lawyer's question as to whether Simpson concurred in Locus' belief that the tip about the undisclosed Scharold fee came from Bishop's ex-wife. The only other opinion that Simpson expressed was that the government's case was correct, but this was acceptable because he summarized only the evidence favorable to the government. Simpson spoke only of evidence already in the record, and, on direct and cross examination, he fully expressed the limited basis of his testimony. We see no error in allowing Simpson to speak.

Campbell and Simpson based their summary charts on testimony and documentary evidence presented to the jury and available to the defense before trial. Both witnesses underwent extensive cross-examination.[7] Bishop argues that the charts should have been excluded because they did not include evidence elicited from government witnesses during cross-examination. This contention fails for the reason given above, that is, that a summary need not address all of the evidence. Bishop also protests that the charts were flawed because they did not list various items that arguably reduced his tax liability. Whether offsets were available was disputed at trial, and therefore, evidence regarding them was in the record and available to the jury, regardless of whether it appeared on the charts. Summaries admitted under Rule 1006 may go to the jury room. There was no abuse of discretion in admitting the summary testimony and exhibits.

The jury instructions regarding the summary evidence were sufficient:

> Charts and summaries were shown to you in order to make the other evidence more meaningful and to aid you in considering the evidence. They are no better than the testimony and the documents upon which they are based, and are not themselves

---

[7]Moreover, at trial, Bishop did not object to admission of many of Campbell's summaries, so review is limited to a determination as to whether a clear error occurred. *See United States v. Cantu*, 167 F.3d 198, 204 (5th Cir. 1999).

independent evidence. Therefore, you are to give no greater consideration of these schedules and summaries than you would give to the evidence upon which they are based.

It is for you to determine the accuracy of the summary charts. You are entitled to consider the charts, schedules, and summaries if you find that they are of assistance to you in analyzing the evidence and understanding the evidence.

This instruction covered both the summary testimony and charts, and properly advises the jury that the information underlying the summaries, not the summaries themselves, is evidence, although the summaries may be a useful aid. The instruction was correct and submission to the jury was not an abuse of discretion.

B.

The district court should not have admitted IRS agents Campbell and Locus' notes regarding meetings they had with Bishop. Personal notes made by an investigator such as an IRS agent are not ordinarily admissible because they are hearsay. *See* Fed. R. Evid. 801(c), 803(8)(B). Rule 801(d)(1)(B) provides an exception when the notes are offered to "rebut an express or implied charge against the declaring of recent fabrication or improper influence or motive." *United States v. Pena*, 949 F.2d 751, 757 (5th Cir. 1991) (quoting Fed. R. Evid. 801(d)(1)(B)).

Bishop's lawyers implied that Locus made mistakes or lied while testifying, but it does not appear that his supposed fabrications were recent or made with an improper motive. The cross examination of Campbell was an attempt to refresh her recollection rather than an effort to imply that her earlier testimony was false. Rule 801(d)(1)(B) cannot be construed to allow the admission of what would otherwise be hearsay every time a law enforcement officer's credibility or memory is challenged; otherwise, cross-examination would always transform hearsay notes into admissible evidence. The error, however, was harmless, as the content of the notes was throughly discussed on

11

both direct and cross examination. Admitting the notes themselves added little to the weight of the evidence in the case.

C.

Bishop submits that the district court erred when it excluded testimony regarding statements made by the defendant's former bookkeeper, Pat Schulmeier, and by the defendant himself. Actually, the statements were hearsay and were not admissible. "'Hearsay' is a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is not admissible unless an exception applies as provided by the Federal Rules of Evidence, other rules adopted by the Supreme Court, or statute. *See* Fed. R. Evid. 802. Bishop argues that Schulmeier's statements, and his own, may be admitted as "statement[s] of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3).

Schulmeier was Bishop's bookkeeper from 1991 to 1997. She died in February 1998. At trial, Bishop sought to introduce testimony that during 1996, Schulmeier met with Marc Grossberg, Bishop's tax lawyer, and Terri Raybourne, Bishop's legal assistant. The testimony proffered through Grossberg was that Schulmeier said she knew Bishop received a $400,000 fee in 1994, that it was her fault it was omitted from the books used to prepare his tax returns, and that she did not know why she failed to record the fee.

Bishop offered Schulmeier's statements in order to prove the truth of their content, that is, to show it was not his fault that all or a portion of the $400,000 fee was not reported to the IRS.

Schulmeier's tendered statement was not an explanation of her current state of mind, but rather was a recitation of her memories of what she did and thought at an earlier date. The district court properly excluded the testimony regarding her statements.

Bishop asserts that his own statements to Grossberg are subject to the same exception to the hearsay exclusion. Grossberg testified that Bishop hired him in 1996 to assist with a 1996 civil audit, but was not allowed to say that Bishop said he did not expect the scope of the matter to be any greater, that is, he did not expect he would face criminal charges. The district court properly excluded this testimony. Bishop's statements to Grossberg did not reflect his then current feelings or plans, but rather were self-serving assertions that he did not have the requisite intent for the crime now charged.

IV.

Bishop moved for a directed verdict at the close of the government's case in chief and again prior to submission of the matter to the jury. He also sought post conviction relief. As to counts one and three, he continues to assert there was not sufficient evidence that a tax deficiency existed, that he acted willfully, or that he committed an affirmative act of evasion. He also argues that there was not sufficient evidence of willfulness in support of count two.

We review the evidence in a light most favorable to the government and make all reasonable inferences and credibility choices in support of the jury's verdict. *See United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999); *United States v. Chesson*, 933 F.2d 298, 303 (5th Cir. 1991); *United States v. Kim*, 884 F.2d 189, 192 (5th Cir. 1989). If any rational trier of fact could have found proof of the essential elements of the crime beyond a reasonable doubt, the verdict will stand. *See Kim*, 884 F.2d at 192. "The evidence need not exclude every reasonable hypothesis of innocence or be wholly

inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." *United States v. Bermea*, 30 F.3d 1539, 1551 (5th Cir. 1994).

A.

To support a conviction for attempted tax evasion, as alleged in counts one and three, the government must prove beyond a reasonable doubt that there was a tax deficiency, an affirmative act constituting an attempt to evade or defeat the tax, and willfulness. *See Sansone*, 380 U.S. at 351, 85 S. Ct. at 1010, 13 L. Ed. 2d at 888. A deficiency is the amount by which the tax imposed by statute exceeds the sum of (1) the amount of tax shown on the return, (2) plus the amount of any previously assessed deficiency, (3) minus any rebate previously received. *See* 26 U.S.C. § 6211; *United States v. Wright*, 211 F.3d 233, 236 (5th Cir. 2000); *Chesson*, 933 F.2d at 303-04.[8] The government must demonstrate the existence of a deficiency beyond a reasonable doubt, but need not prove the extent of the deficiency with mathematical certainty. *See Chesson*, 933 F.2d at 304. There is no deficiency in the absence of a showing that the government is actually due a tax in excess of that reported. *See Willingham v. United States*, 289 F.2d 283, 285 (5th Cir. 1961). Therefore, undeclared deductions, credits, losses carried over from prior years, and so on, should be considered when calculating the

---

[8]Contrary to Bishop's suggestion, the five items he identifies were not "rebates" reducing the extent of any deficiency which would otherwise exist. Rebates are not credits, refunds, or other payment made by the taxpayer, but rather are payments the IRS makes to a taxpayer "on the ground that the income tax imposed. . . is less than the excess of (1) the amount shown as the tax by the taxpayer upon the return increased by the amount previously assessed (or collected without assessment) as a deficiency over (2) the amount of rebates previously made." Treas. Reg. § 301.6211-1(f). For example, a refund made because too much tax was withheld at the source is not a rebate, but a refund made because the IRS determined taxpayer's return overstated the tax due is a rebate. *See id.* Moreover, the existence of a rebate will actually increase the extent of deficiency, not decrease it according to the formula above, as the taxpayer returns the credit now known to be unwarranted. *See Miles Prod. Co. v. CIR*, 987 F.2d 273, 276-77 & n.3 (5th Cir. 1993); *United States v. Wilkes*, 946 F.2d 1143, 1149 (5th Cir. 1991).

14

deficiency. *See Sansone*, 380 U.S. at 353, 85 S. Ct. at 1011, 13 L. Ed. 2d at 888; *Wright*, 211 F.3d at 236-37; *United States v. Fogg*, 652 F.2d 551, 555 (5th Cir. 1981); *Willingham*, 289 F.2d at 285.

Under 26 U.S.C. § 7201, willfulness is "a voluntary, intentional violation of a known legal duty." *Kim*, 884 F.2d at 192. Evidence is usually circumstantial as direct proof is rarely available. *See id*. A wide range of conduct can support a finding of willful attempt to evade taxation, for instance: keeping a double set of books, making false entries or alterations, creating false invoices or documents, destroying books or records, concealing assets or covering up sources of income, handling one's affairs to avoid making the records normally accompanying transactions of a particular kind, any conduct likely to mislead or conceal, holding assets in others' names, providing false explanations, giving inconsistent statements to government agents, failing to report a substantial amount of income, a consistent pattern of underreporting large amounts of income, or spending large amounts of cash that cannot be reconciled with the amount of reported income. *See Chesson*, 933 F.2d at 304; *Kim*, 884 F.2d at 192; *United States v. Calles*, 482 F.2d 1155, 1159-60 (5th Cir.1973).

1.

At trial it was established that Bishop owed a tax for 1991, even giving due regard for all appropriate credits. Bishop identifies five items he asserts offset any underpayment attributable to his failure to report the fees he received in 1991. He first explains he made a "payment of $75,000 to the IRS in 1988 when he had a net loss that has not been shown as a credit elsewhere." This was a payment of employment taxes, he received an appropriate deduction, and the payment has no further role in his income tax liability.[9] Second, Bishop asserts he made a $38,360 overpayment in

_____

[9]Locus testified that he was suspicious of a net operating loss of approximately $85,000 reported on Bishop's 1988 return, and was particularly interested in a $75,000 expense attributed to payroll taxes and related interest expenses. Locus determined that a check for $75,000, payable to the IRS, was drawn on Bishop's account at Bear

15

1989, and that this payment was not applied to his 1990 estimated tax, as he requested. Third, Bishop says his 1989 income was overstated because his return was prepared using the status "married filing joint return." Bishop later changed his status to "married filing separate return" but made no other adjustments. At trial, he presented testimony that under Texas community property law, his wife should have reported half the income. The net effect of this error, however, was not specified at trial and remains doubtful because other errors in the return may have displaced any positive effect of the error in filing status.[10] Next, half of a $50,000 payment Bishop made to the IRS in April 1991 should have been applied to 1990. The IRS treated the entire amount as an estimated tax payment for 1991 instead, ignoring the instructions accompanying the check. Finally, Bishop indicates the IRS never refunded $43,171 attributable to excessive estimated tax payments made during 1991. Bishop clearly underreported his income that year and there is no reason to believe he should receive this refund.

Accordingly, Bishop was not entitled to credit for the first and fifth items, and the amount of the third is an indeterminate amount. The four items of known quantity total $181,531. A substantial deficiency therefore remained if one accepts Campbell's virtually uncontested testimony that Bishop underpaid by at least $250,000.00.[11] Of course, the exact amount of the deficiency

Stearns. His information returns master file transcript, a record of all payments made to the IRS, shows a $74,896 payment drawn from the Bear Stearns account to pay employee benefits taxes.

Bishop's 1988 tax return is not in evidence, but a draft of a portion of the return shows a net operating loss of $86,327. Bishop's 1989 return includes a net operating loss of $85,226, with no further explanation. The government suggest the loss from the prior year was carried over, and there is no evidence to the contrary.

[10]The effect of Bishop's filing status was also discussed in his presentence filings. According to Charles O. Matthys, Bishop's expert witness, Bishop failed to report all of his 1989 income, and this displaced the positive effect of the error in filing status.

[11]This figure includes $10,247.00 in self employment tax. Matthys largely agreed with Campbell's analysis, particularly regarding the Scharold and Cash fees, although Matthys believed Bishop's unreported income from the last quarter of 1991 was $110,085.72, not $150,344.77 as Campbell stated. Matthys did not provide an estimate as

16

cannot be determined. The point is first, that the evidence does not show that Bishop was entitled to credit for all five items he identifies, and second, that a substantial discrepancy still exists when credit is given. Accordingly, Bishop's argument that there was not sufficient evidence of deficiency is without merit.

There also was ample evidence that Bishop willfully engaged in attempts to evade income tax due for 1991. The evidence established that Bishop, as proprietor of GMBA, kept track of the firm's finances. He obviously knew when substantial fees were received. He directly caused the reversal of the initial GMBA ledger entry regarding the $933,333.33 Scharold fee. He deposited that fee and a substantial portion of the $183,666.67 Cash fee in his personal accounts, circumventing his firm's normal record keeping process. Responsibility for accounting for the fees shifted to Bishop himself, but he did not fulfill his responsibility.

Instead, he provided incomplete and inaccurate information to his return preparer, Elwyn Shaw, and to Joel Reed, who replaced Shaw and completed the 1991 return. When Shaw asked about the two entries regarding the Scharold fee, Bishop declined to explain them. Bishop did not let Reed see the ledger at all, and told him that income received during the last quarter of 1991 and recorded in GMBA's general ledger would appear on a corporate return, which was not true. Although Locus and Campbell generally found Bishop to be cooperative, he concealed or declined to provide information regarding receipt of non-reported income, depositing business checks in personal accounts, and purchases of expensive assets including real estate and jewelry for his then-fiancée. Bishop acknowledged reviewing the 1991 return. He advised Reed to add $140,000 to his income because he paid that sum to his ex-wife, but ignored the fact that his final reported gross

---

to the amount of tax Bishop owed, but obviously there would be a significant underpayment.

17

income from the practice of law, $988,599.25, could not possibly include the total of the Scharold and Cash fees, let alone his other business income. The evidence of Bishop's actions more than adequately supports the jury's verdict as to 1991.

2.

Bishop's claim that there is no evidence of an affirmative act of evasion with respect to the 1994 tax year is incorrect. As stated above, Bishop knew when large fees were received at the firm. The payments deposited at Chappell Hill Bank were substantial. Bishop specifically requested that the $400,000 check be deposited in his personal account, knowing that such a transaction would prevent the fee from being recorded in his firm's books. He then gave inaccurate and misleading information to his return preparers, telling them that there was no income other than that listed on the firm's books. He reviewed the return before signing it. His confusion with regard to the partial reporting of the $400,000 does not excuse his other actions, particularly when they are viewed in combination with Bishop's experience as a lawyer, his failure to file timely returns, and the large sums of money involved.

B.

To prove the willful filing of a false return in violation of 26 U.S.C. § 7206, the government must show (1) that a false return was made and signed, (2) that the false entry was material, (3) that the return contained a written declaration that it was made under the penalties of perjury, (4) that the defendant did not believe that the return was true and correct when signed, and (5) that the defendant signed willfully and with specific intent to violate the law. *See United States v. Bishop*, 412 U.S. 346, 350, 93 S. Ct. 2008, 2012, 36 L. Ed. 2d 941, 945 (1973); *United States v. Wisenbaker*, 14 F.3d 1022, 1024 (5th Cir. 1994); *United States v. Robinson*, 974 F.2d 575, 579 (5th Cir. 1992).

18

Bishop admitted that he signed the 1991 return, the falsity of which was virtually undisputed. The amount of the underreported income is such that the error was material. The reversal of the initial Scharold fee entry, along with the bypassing of the operating account with the Cash fee, supported a finding of knowledge and willfulness. The evidence produced at trial is sufficient to sustain the conviction.

V.

Bishop asserts that the district court's jury instructions as to the deficiency element of tax evasion were inadequate. Jury instructions must, as a whole, correctly state the law and clearly inform jurors of the principles of law applicable to the factual issues. *See United States v. Martinez*, 190 F.3d 673, 678 (5th Cir. 1999); *United States v. Cartwright*, 6 F.3d 294, 300 (5th Cir. 1993). The elements of the crime that the government needs to prove beyond a reasonable doubt must be explained to the jury through the court's instructions. *See Sandstrom v. Montana*, 442 U.S. 510, 520, 99 S. Ct. 2450, 2457, 61 L. Ed. 2d 39, 48 (1979); *United States v. Moser*, 123 F.3d 813, 826 (5th Cir. 1997). The trial judge is not obligated to give a requested instruction if its content is adequately covered by the other charges. *See United States v. Asibor*, 109 F.3d 1023, 1035 (5th Cir. 1997).[12]

As we have already stated, the elements of tax evasion are: (1) a tax deficiency, (2) an affirmative act constituting an evasion or attempted evasion of the tax, and (3) willfulness. *See Sansone v. United States*, 380 U.S. at 351, 85 S. Ct. at 1010, 13 L. Ed. 2d at 888. The district court

---

[12]"No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection." Fed. R. Crim. P. 30. At trial, Bishop did not challenge the instruction on deficiency, although he objected to the instruction on willfulness, and, prior to trial, proposed a somewhat more detailed instruction on deficiency.

advised the jury that a deficiency was present if "the defendant owed substantially more federal income tax for the calendar years 1991 (Count One) and 1994 (Count Three) than was declared due on his income tax returns." There were no additional instructions as to how to calculate the deficiency. According to Bishop, the instruction limited the jury's inquiry to the content of the returns he filed, and prevented consideration of five credits, refunds, or payments he made or qualified for but did not report on his returns. Therefore, he asserts he paid more than he actually owed and did not commit tax evasion, as no deficiency was present.

The district court did not specify that the jury should consider unreported payments Bishop may have made in previous years. The jury could, however, still take such items into account when determining the amount of tax Bishop actually owed, regardless of whether each item appeared on his returns. In closing arguments, Bishop's lawyers stressed that he made substantial payments to the IRS on several occasions. The jury had the opportunity to consider these past payments when determining whether a deficiency was present. The jury may not, however, have found the evidence to be convincing. As we explain above, Bishop was not entitled to credit for all five items, and even if he was, a substantial deficiency would remain. Therefore, the outcome of the trial was consistent with the jury's consideration of the potential credits identified by Bishop.

Bishop also complains that the trial court did not require the jury to find that he knew of any tax deficiency. Knowledge is an essential element of tax evasion and of signing a false tax return. Bishop's assertion, however, is without merit. The court repeatedly and throughly informed the jury that proof of knowledge on the part of the defendant was required. Instructions included definitions of the terms "knowingly" and "willfully." The court explained that the charged crimes were specific intent crimes, and that therefore the government must prove the defendant not only had the intent to

20

perform a particular act, but also knew that act was illegal. Methods of demonstrating intent were described. Willfulness was discussed as an element of each of the charged crimes. As we state above, there was ample evidence of intent on Bishop's part. The jury properly, and in accordance with the court's instructions, found that Bishop had knowledge of the deficiency.

VI.

Bishop appeals the district court's ruling denying his motion for a new trial in light of juror Tharp's criminal history. A district court's decision denying of a motion for a new trial on the basis of juror bias is reviewed for abuse of discretion. *See United States v. Doke*, 171 F.3d 240, 246 (5th Cir. 1999); *United States v. Soto-Silva*, 129 F.3d 340, 343 (5th Cir. 1997). In order to obtain a new trial, the moving party must demonstrate that a juror failed to answer a material voir dire question honestly, and that a correct response would have been a valid basis for a challenge for cause. *See McDonough Power Equip. Corp. v. Greenwood*, 464 U.S. 548, 556, 104 S. Ct. 845, 850, 78 L. 28 L. Ed. 2d 663, 671 (1984); *Doke*, 171 F.3d at 246-47. Motivations for concealing information may vary, but only those affecting a juror's impartiality can truly be said to affect the fairness of a trial. *See McDonough*, 464 U.S. at 556, 104 S. Ct. at 850, 28 L. Ed. 2d at 671. Therefore, once the trial is complete, a felon's serving as a juror is not an automatic basis for a new trial. The defendant must demonstrate that the juror was actually biased or fundamentally incompetent. *See Soto-Silva*, 129 F.3d at 343; *United States v. Scott*, 854 F.2d 697, 698-99 (5th Cir. 1988); *United States v. Gates*, 557 F.2d 1086, 1088 (5th Cir. 1977) (quoting *Ford v. United States*, 201 F.2d 300, 301 (5th Cir. 1953)). *See also Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1058-59 (9th Cir. 1997); *United States v. Langford*, 990 F.2d 65, 68-70 (2d Cir. 1993); *United States v. Humphreys*, 982 F.2d 254, 261 (8th Cir. 1992); *United States v. Boney*, 977 F.2d 624, 633-35 (D.C. Cir. 1992).

21

Actual bias exists when a juror fails to answer a material question accurately because he is biased. *See McDonough*, 464 U.S. at 556, 104 S. Ct. at 850, 784 L. Ed. 2d at 671. In the majority of situations, the party seeking a new trial must demonstrate bias through admission or factual proof. *See Scott*, 854 F.2d at 699 (quoting *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976)). Bias may, however, be implied or presumed in extreme circumstances, including when the juror is employed by the prosecuting agency, is a close relative of a participant in the trial, or is somehow involved in the transaction that is the subject of the trial. *See id.* (quoting *Smith v. Phillips*, 455 U.S. 209, 222, 102 S. Ct. 940, 948, 71 L. Ed. 2d 78, 89 (1982) (O'Connor, J., concurring)). Indicia of partiality are particularly problematic when coupled with the juror's lies or other efforts to hide a potential disqualification. *See id.* at 699-700.

The Ninth Circuit presumed bias was present in two recent cases in which jurors engaged in a pattern of lying and other conduct intended to cover up their disqualifications. In *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998), a juror in a homicide case did not respond to voir dire questions as to whether she or any close family members had a criminal history or were crime victims. Later, it was discovered that the juror's brother was shot and killed six years earlier. The juror explained that she did not think she had to say anything because she believed her brother's death was an accident. The court presumed she was biased because her explanation was not plausible. She was close with her brother, was the plaintiff in a civil suit regarding his death, knew he was shot several times in the back and head, and knew the shooter was charged with murder. Moreover, she failed to mention that her husband was charged with rape a month before the trial, that she was the victim of a number of burglaries and other crimes, and that a number of her close relatives committed serious crimes. Her

22

pattern of conduct showed that she sought to serve on the jury despite circumstances that she knew could disqualify her and which may well have affected her ability to be impartial.

In *Green v. White*, 232 F.3d 671 (9th Cir. 2000), a juror failed to reveal his assault conviction in a juror questionnaire and in voir dire. He explained that the questions were confusing and said he forgot about his conviction, but it was impossible that he forgot the six months he spent in jail. He also commented during the trial that he always knew the defendant was guilty. Again, the pattern of lies suggested a desire to serve on the jury and determine the outcome of the case.

On the other hand, inaccurate responses to voir dire questions are excused when caused by inattention or when a query does not elicit the specific information relevant to the juror's disqualification. See cases cited in *Scott*, 854 F.2d at 700 & n.12. Failure to disclose a conviction due to a mistaken, but honest belief the record was expunged, or due to embarrassment, also does not suggest bias. *See United States v. Langford*, 990 F.2d at 66-67, 69-70; *United States v. Humphreys*, 982 F.2d at 260-61. Even when a juror's non-disclosure is dishonest as opposed to mistaken, his behavior is not a basis for reversal unless the dishonesty appears to be rooted in bias or prejudice. *See Coughlin*, 112 F.3d at 1061.

The deferred adjudication statutorily disqualified Tharp from serving on a jury. 28 U.S.C. § 1865(a) directs each federal judicial district to set up a system to determine whether each person called for jury duty is qualified to serve. 28 U.S.C. § 1865(b) lists situations in which an individual is statutorily disqualified from serving as a juror, including when he "has a charge pending against him for the commission of, or has been convicted in a State or Federal court or record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored." 28 U.S.C. § 1865(b)(5).

23

Article 42.12, section 5(a) of the Texas Code of Criminal Procedure allows deferred adjudication:

> [W]hen in the judge's opinion the best interest of society and the defendant will be served, the judge may, after receiving a plea of guilty or plea of nolo contendere, hearing the evidence and finding that it substantiates the defendant's guilt, defer further proceedings without entering an adjudication of guilt, and place the defendant on community supervision.

Once the defendant successfully completes community supervision, the proceedings are dismissed. *See* Tex. Code Crim Proc. art. 4212, § 5(c). If the defendant violates the conditions of supervision, the court may enter an adjudication of guilt on the original charges and impose a punishment. *See id.* § 5(b). A dismissal and discharge upon completion of supervision is not a "conviction" triggering disqualifications or disabilities usually visited upon convicted felons. *See id.* § 5(c). Until supervision is complete, however, the deferred adjudication is treated as a pending charge. *See Thomas v. State*, 796 S.W.2d 196, 197-98 & n.1 (Tex. Crim. App. 1990).

Accordingly, Tharp's deferred adjudication was equivalent to a pending charge. A third degree Texas felony is punishable by imprisonment for two to ten years. *See* Tex. Penal Code § 12.34. Therefore, under 28 U.S.C. § 1865(b)(5), Tharp could not serve on Bishop's jury. Her status was an appropriate basis for a challenge for cause. The inquiries on the questionnaire and during voir dire sought to elicit information about her status, and were directly on point. Therefore her failure to respond was material. A new trial, however, is not warranted because Bishop did not demonstrate that Tharp was biased.

Tharp could not be presumed to be biased. Unlike the jurors in *Dyer* and *White*, she offered a plausible explanation for her failure to answer the juror questionnaire and voir dire inquiries regarding her criminal history accurately. She explained to the trial judge that the lawyer who

24

represented her in the embezzlement matter told her that because adjudication of the charge was deferred, she need not tell anyone about it, for instance when applying for a job. Accordingly, she answered "no" on the questionnaire and did not raise her hand during voir dire because she believed the questions did not apply to her situation. Tharp was wrong, but it is quite possible she misunderstood the nature of the deferred adjudication. As demonstrated by the discussion above, the analysis required to arrive at the conclusion that Tharp could not serve is rather involved, especially when considered in conjunction with Tharp's lawyer's instructions to her.

Tharp's probation officer, Josette Robinson, suggested that Tharp did not respond to the questions truthfully because she was in denial about her criminal history. Robinson believed Tharp knew she could not serve on a jury, or at least knew she should have asked Robinson what to do. This possibility alone is not determinative. Regardless of whether Tharp made a simple mistake or actually lied in order to escape her past, there is no suggestion that she especially desired to serve on the jury. Her motivations appear to have been purely personal and do not indicate she was prejudiced. Nor are there any other troubling circumstances such as a relationship with one of the participants. Accordingly, bias cannot be implied or presumed.

Nor did Bishop present factual proof that Tharp was partial to one side or the other. Tharp herself denied she had any improper motive, and there is no contradictory evidence. She said she did not especially want to serve on the jury. Her crime was somewhat similar to Bishop's, and she knew what it felt like to be in his position, but did not feel sympathy for him. Nor did she favor the government. She did not reveal her experiences to the other jurors. She is not known to have expressed any strong opinions at the time the trial took place, or later. As the trial court noted, she probably was not particularly influential in deliberations, as the other jurors were older and more

25

highly educated, and the deliberations lasted only a day despite the length of the trial. Bishop's lawyer questioned Tharp about her bankruptcy discharge, which occurred about a year after the embezzlement matter was considered, and suggested she owed taxes on the stolen money. Apparently the possibility had not previously occurred to Tharp, and therefore could not influence her. The district court did not abuse its discretion by denying Bishop's motion for a new trial.

## VII.

Although Tharp was statutorily disqualified from serving on Bishop's jury, there is no evidence she was biased against him. The district court should not have admitted the IRS agents' notes, which were hearsay, but the error was harmless. Bishop's remaining arguments are without merit. We confirm Bishop's convictions on all three counts.

AFFIRMED.