# United States Court of Appeals
## For the First Circuit

Vol. II of II

Nos. 02-2158
02-2159
02-2165
02-2166
02-2188

UNITED STATES OF AMERICA,

Appellee,

v.

VINCENT A. CIANCI, JR., FRANK E. CORRENTE, and
RICHARD E. AUTIELLO,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, Chief U.S. District Judge]

Before

Howard, Circuit Judge,
Campbell and Stahl, Senior Circuit Judges.

John A. MacFadyen for appellant Vincent A. Cianci, Jr.
Anthony M. Traini for appellant Frank E. Corrente.
Richard C. Bicki with whom Cerilli & Bicki and Edward
Gerstein were on brief for appellant Richard E. Autiello.
Donald C. Lockhart, Assistant United States Attorney with
whom Margaret E. Curran, United States Attorney, Richard W. Rose
and Terrence P. Donnelly, Assistant United States Attorneys were
on brief, for appellee.

August 10, 2004

**III.       The Remaining Convictions**

   A.   Federal Bribery Conspiracy (Autiello)

Autiello argues that there was insufficient evidence to support his conviction for federal bribery conspiracy in connection with the Maggiacomo Job scheme.  Autiello contends that, because there was no direct evidence about either the identity of his co-conspirator or the fate of the $5,000 Mary Maggiacomo paid him, the evidence gave nearly equal circumstantial support to an inference that he pocketed the money as a payment for _his_ efforts with the police department (with which he had influence) on behalf of Joseph Maggiacomo as it did to an inference that he passed the bribe along to some public official, or at least conspired to do so.  See United States v. Andujar, 49 F.3d 16, 20 (1st Cir. 1995) ("If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilty and a theory of innocence of the crime charged, this court must reverse the conviction.") (citation and internal quotation marks omitted).   The argument is unconvincing.

There was evidence that, during a face-to-face meeting in which his favorable intercessions were sought, Autiello told Mary Maggiacomo and her husband that Providence police officer positions were prized and that Joseph Maggiacomo's chances were not good because the Maggiacomos were not Providence taxpayers and had not made any "contributions."  In nearly the same breath, Autiello told

them that, if they wanted Joseph to be accepted into the police academy, they would have to come up with $5,000 in cash. The juxtaposition of these two comments, combined with the evidence that Autiello himself held no authority to make police academy admission decisions, permitted a reasonable inference that the $5,000 was to be a political "contribution" that would serve as Joseph's ticket of admission when passed along to someone with authority over academy admission decisions.

### B. Hobbs Act Attempted Extortion and Extortion Conspiracy (Corrente)

Corrente makes three arguments in favor of reversing or vacating his convictions for Hobbs Act attempted extortion and Hobbs Act extortion conspiracy in connection with the Freitas Lease and Freitas Invoices schemes: (1) there was insufficient evidence that these schemes had the constitutionally required impact on interstate commerce; (2) there was insufficient evidence that he affirmatively acted in such a way as to be fairly accused of having attempted or conspired to engage in extortion; and (3) the district court's jury instructions erroneously described what was required to establish an attempt or conspiracy to engage in extortion. There is some question whether each of these arguments was made below as to each of the three convictions, but we bypass issues of forfeiture because none of the arguments is persuasive on its merits.

Corrente's first argument is largely based on an assertion that his convictions are unconstitutional because his offense conduct had to, but did not, have more than a de minimis effect on interstate commerce in order to jibe with the Supreme Court's decisions in United States v. Lopez, 514 U.S. 549 (1995), and United States v. Morrison, 529 U.S. 598 (2000). After briefs were filed in this case, another panel of the court rejected this argument, United States v. Capozzi, 347 F.3d 327, 334-336 (1st Cir. 2003), so we must reject it too, see, e.g., United States v. Downs-Moses, 329 F.3d 253, 263 (1st Cir. 2003).

Corrente alternatively argues that no reasonable factfinder could have found that his offense conduct had such a de minimis effect. He is wrong.

With respect to Corrente's attempted extortion in connection with the Freitas Lease scheme, the jury could have found that, but for Freitas' agreement to pay Corrente for favorable intervention on his behalf with the school department, there was a realistic probability that the City contractor (an entity engaged in interstate commerce and whose lease agreement would be a transaction affecting interstate commerce[12]) would have leased space in Cranston, Rhode Island. This evidence alone satisfies

---

[12]The contractor, the Marriott Corporation, supplied lunches and custodial services to all Providence schools. There was evidence that the company was incorporated in New York and had offices in Washington, D.C., and Newark, Delaware.

constitutional concerns, even if the space for which Corrente advocated actually proved to be a better fit for the contractor. See Capozzi, 347 F.3d at 335 (extortionate conduct need only create a realistic probability of an effect on interstate commerce) (citations omitted); id. at 337 (conviction for attempted extortion requires only a showing that the identified effect would have occurred had the defendant succeeded in the extortion); United States v. Tormos-Vega, 959 F.2d 1103, 1113 (1st Cir. 1992) (extortionate conduct meets constitutional requirements even where it "has a beneficial effect on interstate commerce") (citation and internal quotation marks omitted); id. (where the victim's acquiescence in an extortion results in a transaction with effects on interstate commerce, constitutional concerns are satisfied).

With respect to the Freitas Invoices scheme, the jury could have found that a city contractor that was indisputably engaged in interstate commerce was deprived of $1,100 in order to facilitate payments to which it was entitled. This was enough. See Capozzi, 347 F.3d at 337 ("One common method for the government to establish the required 'de minimis effect' on interstate commerce is to show that the defendant's activity "minimally depletes the assets of an entity doing business in interstate commerce.") (quoting United States v. Nguyen, 246 F.3d 52, 54 (1st Cir. 2001)).

Corrente's other two arguments are very difficult to follow. In the main, they appear to be interrelated attacks on the correctness of Evans v. United States, 504 U.S. 260 (1992). Evans interpreted the provision of the Hobbs Act under which Corrente was convicted -- one which prohibits extortion by means of "the obtaining of property from another, with his consent, . . . [2] under color of official right," 18 U.S.C. § 1951(b)(2) -- not to require that the government prove that the defendant initiated the extortionate transaction or otherwise induced the payments. Rather, "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." Id. at 268. Corrente appears to believe that the Evans Court erred in concluding that the defendant need not induce the payment or otherwise initiate the event. See Corrente Br. at 49. To the extent that he is so arguing, Corrente acknowledges that we are powerless to grant him relief and that he must go to the Supreme Court. Id.

There are hints of other arguments in Corrente's brief, but none is sufficiently developed to warrant consideration on the merits. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In any event, our review of the record convinces us that there is no basis for reversing or vacating Corrente's attempted extortion and extortion conspiracy convictions.

Any sufficiency challenge is doomed because there was sufficient evidence to support the convictions even under the more demanding interpretation of the Hobbs Act for which Corrente advocates.  With respect to the Freitas Lease scheme, the jury could have found that Corrente "induced" payments from Freitas when, at one point prior to receiving any money related to this scheme, he suggested to Freitas that City Hall could either hurt or help his chances of securing the lease (depending, presumably, on whether Freitas anted up).  With respect to the Freitas Invoices scheme, the jury could have found that Pannone, Corrente's co-conspirator, induced payments on Corrente's behalf by encouraging Freitas to "throw something" at Corrente – i.e., to "pay to get paid."

So too with the jury instructions.  As clarified in a supplemental charge just prior to the return of the verdicts, the instructions on the attempted extortion and extortion conspiracy charges were, if anything, overly generous to Corrente.  And because the evidence was sufficient to support the convictions even under the arguably too lenient instructions, any error was harmless.  See Fed. R. Crim. P. 52(a); United States v. Royal, 100 F.3d 1019, 1027 (1st Cir. 1996).

**IV.     Admission of the Pannone Tapes**

Defendants contend that the district court violated various Rules of Evidence and their confrontation and due process

rights in admitting into evidence certain tape-recorded conversations among Freitas (who was acting as a government agent), Pannone, the Chairman of the Board of Tax Assessment Review and an alleged co-conspirator, and various other individuals, some identified and others not. They also argue that the court erred in precluding them from interposing objections to the admission of these tape recordings for their failure to abide by a procedural order requiring that Rule 403 and 404(b) objections be identified with specificity in advance of trial.

### A. _Petrozziello_ determination

Defendants argue that the district court erred when it concluded that Pannone's statements fell outside of the hearsay rule under Fed. R. Evid. 801(d)(2)(E).[13] We review this determination for clear error. United States v. Geronimo, 330 F.3d 67, 74 (1st Cir. 2003); Marino, 277 F.3d at 25. In determining whether the Government has met Rule 801(d)(2)(E) prerequisites, the district court must determine that it is "more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." United States v. Petrozziello, 548

---

[13]"A statement is not hearsay if . . . [t]he statement is offered against the party[-opponent] and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).

F.2d 20, 23 (1st Cir. 1977). We refer to this determination as a "Petrozziello ruling." Geronimo, 330 F.3d at 75.

Defendants contend that there was "scanty" evidence of a conspiracy among defendants and Pannone. They argue that Pannone's taped statements were unreliable and there was insufficient extrinsic evidence of the conspiracies because some of the conversations on the tape were "rambling and unfocused" and not all of the defendants were ultimately convicted as part of the three racketeering acts--the Ronci Estate, Freitas Lease, and Freitas Invoices schemes--of which Pannone had first-hand knowledge.

We disagree. As we have detailed supra, the government presented sufficient evidence of a RICO conspiracy--conspiracy, enterprise, and pattern of racketeering activity--to satisfy the evidentiary standard set forth in Petrozziello. In particular, on tape, Corrente intimated to Freitas with respect to the Freitas Lease scheme, "Don't get involved with Joe unless something happens." Corrente also admits on tape to receiving cash from Pannone in connection with the Pay-to-Get-Paid scheme. Pannone chaired the Board of Tax Assessment Review, a municipal office which we have already detailed to be crucial to the conspiracy. Both Freitas and Ead testified at trial to Pannone's involvement in the Ronci Estate, Freitas Lease, and Pay-to-Get Paid schemes. With regard to the Ronci Estate scheme, the evidence showed a sub-conspiracy among Cianci, Corrente, and Pannone to extort money from

the Ronci estate in exchange for a reduction of back taxes owed to the City and the assessment of property owned by the estate. At the times the taped statements were made, the evidence also shows a conspiracy between at least Corrente and Pannone to extort money from Tony Freitas and JKL Engineering in exchange for assistance in leasing property owned by Freitas to the City or to the Marriott Corporation. Third, the evidence was sufficient to establish a conspiracy between at least Corrente and Pannone to extort money from Freitas and JKL in exchange for facilitating payments due from the City to JKL.

Pannone's taped statements were not made "after the fact," but were uttered as part of and in furtherance of the conspiracy. In these statements, Pannone described the roles that he, Cianci, Corrente, and Ead played in the conspiracy and in particular, what he and Freitas should do to carry out the Freitas Lease and Pay-to-Get-Paid schemes. Such statements are well within the core of Rule 801(d)(2)(E). See United States v. Martinez-Medina, 279 F.3d 105, 117 (1st Cir.), cert. denied, 537 U.S. 921 (2002); United States v. Eke, 117 F.3d 19, 21 (1st Cir. 1997). The district court did not commit clear error in admitting the Pannone tapes and we decline to reverse defendants' convictions on Petrozziello grounds.

B.       Confrontation Clause and Due Process claims

Defendants contend that Pannone's taped statements are inherently unreliable and hence should not have been admitted in evidence. As a constitutional matter, they claim that the statements' unreliability implicates Sixth Amendment witness confrontation concerns. This Court reviews Confrontation Clause challenges de novo. United States v. Ventura-Melendez, 275 F.3d 9, 15 (1st Cir. 2001). The Confrontation Clause does not require "a showing of unavailability as a condition to admission of the out-of-court statements of a nontestifying co-conspirator, when those statements otherwise satisfy the requirements of Federal Rule of Evidence 801(d)(2)(E)." United States v. Inadi, 475 U.S. 387, 391 (1986). It also "does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)." Bourjaily v. United States, 483 U.S. 171, 183-84 (1987).

Defendants argue that notwithstanding Inadi and Bourjaily, Pannone's statements should not have been admitted because he was unavailable and unreliable. They assert that the present case is anomalous and that "corruption stings" such as this one should not fall within Inadi and Bourjaily. We find no case law excepting the case from the Inadi and Bourjaily rules. Defendants further suggest that Pannone was outside of his "natural habitat" because Freitas was eliciting incriminating statements from him as part of his cooperation with the FBI. Pannone,

however, was unaware that he was being stung.  We see no reason how his behavior would have been different had Freitas been making the same conversation without the FBI's direction.

To further address defendants' contention that Pannone's statements are inherently unreliable, we agree with the district court that Pannone "did have or was in a position to have firsthand knowledge of some of the things that he testified about."  He was an insider to the conspiracy.  Again, he was directly involved and even played a supervisory role in the Ronci Estate, Freitas Lease, and Freitas Invoices schemes.  Trial testimony by Ead, Rocha, Freitas, and others corroborated Pannone's taped statements setting out how Corrente was often the middleman in the racket, that Cianci used Corrente as a buffer, and that money given to Corrente found its way into the campaign and eventually benefitted Cianci or the administration in some way.  Taped conversations between Freitas and Corrente confirmed the same.

The government questions Cianci and Corrente's motive for failing to call Pannone as a witness for cross-examination as Fed. R. Evid. 806 permits.  Cianci and Corrente repeatedly contend that Pannone was unavailable to them because he would assert his Fifth Amendment rights against self-incrimination if called to testify. They claim that Pannone's behavior was "orchestrated" by the Government in their plea arrangements with him.

This alleged "attempt to thwart cross-examination" forms the basis of defendants' Fifth Amendment due process claim. The procedural travel of the case, however, reveals little to support this accusation. The indictment in this case originally named Pannone as a defendant on Counts 1, 2, 8, 9, 16-19, and 21-24. On February 14, 2002, he signed a plea agreement in which he agreed to plead guilty to Counts 1, 2, 8, 16, 19, and 22. The government agreed to dismiss the remaining counts at sentencing. Hence, dismissal of the remaining charges against Pannone was contingent upon sentencing.

On April 16, 2002, during a hearing to resolve defendants' motion to exclude the Pannone tapes, Corrente complained that Pannone's plea agreement had "left open" the remaining counts, suggesting that Pannone's fear of the government's handling of the remaining counts would cause him to assert his Fifth Amendment rights if he were called by the defense to testify. The court, though ultimately rejecting defendants' legal arguments, assured them that it would try to accelerate Pannone's sentencing, which at that time had been scheduled for July.

Thereafter, the district court moved up Pannone's sentencing in order to accommodate defendants in this case. Pannone was sentenced on May 24, 2002, while the government was still presenting its case-in-chief and almost two weeks before the

defense presented their own case. Immediately after sentencing, the government moved to dismiss the remaining counts against Pannone; the court granted the motion. During a bench conference four days after Pannone's sentencing, Corrente's counsel briefly remarked that he had been informed by Pannone's counsel that Pannone would persist in his Fifth Amendment claim "because of a variety of reasons which I won't go into right now." Nothing more was made of these "reasons."

After this point, defendants did not attempt to call Pannone as a witness. We find no evidence that Pannone would have invoked his Fifth Amendment right against self-incrimination if called to testify, and whether the court would have permitted him to do so. There simply is no evidence of an "orchestration" by the government to keep Pannone away from defendants. Thus, there were no constitutional infringements here.[14]

C. Rules 403 and 404(b)

Finally, with respect to the Pannone tapes, defendants argue that the district court erred by failing to consider their objections to admission of the tapes under Fed. R. Evid. 403[15] and

---

[14]To the extent that defendants' due process claim incorporates their argument that Pannone's statements are unreliable, our affirmance of the district court's <u>Petrozziello</u> ruling sufficiently responds to that claim.

[15]"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless

404(b).[16] They claim that they made timely objections pre-trial. They further recount that the court decided not to address the objections prior to trial, but then mistakenly at trial ruled that defendants waived their right to object to admission of the tapes.

We first recount the procedural history giving rise to this issue. On April 24, 2001, the government provided defendants with copies of the two hundred tapes relating to their investigation of defendants, along with an index showing the dates of the recordings and the conversation participants. Three days later, the court issued an Arraignment and Pre-trial Discovery Order, whereby the government was ordered to provide the defendants with transcripts of the tapes. The court also ordered that all pre-trial motions be filed by December 31, 2001.

The government eliminated all but twenty-two tapes as possible trial exhibits. By October 31, 2001 -- two months before the deadline for pre-trial motions and six months before the

_____

presentation of cumulative evidence." Fed. R. Evid. 403.

[16]"Other Crimes, Wrongs, or Acts-Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Fed. R. Evid. 404(b).

commencement of trial -- the government had provided transcripts of these twenty-two tapes to defendants.

On March 28, 2002, the district court issued a Pre-trial Scheduling Order, which read:

> On or before April 12, 2002, counsel for any party disputing the audibility of admissibility of any such recording or the accuracy of any such transcript of any such transcript shall file an objection identifying the recording to which objection is being made. Memoranda in support of objections to the accuracy or completeness of transcripts shall be accompanied by copies of the transcripts objected to on which proposed deletions and corrections are noted.
> In offering recorded conversations, counsel shall make every effort to edit out footage that contains no audible discussion or contains irrelevant material so that the jury will not be required to listen for protracted periods of time to portions of recordings that provide little or no assistance in determining the pertinent facts. In order to achieve that objective, counsel shall meet and confer, in advance, in an effort to resolve any disputes with respect to editing.
>
> . . . Failure to comply with the provisions of this paragraph may be considered as a waiver, by the proponent, of the right to offer the recorded conversation(s) at issue; or, alternatively, as a waiver of the right to object to omission of the recorded conversation(s) and/or dispute the accuracy or completeness of the transcript, as the case may be.

On April 8, 2002, defendants filed a motion objecting to the admission of the Pannone tapes. They based their motion primarily on Petrozziello and constitutional grounds, and mentioned Rules 403 and 404 in a general observation that "any given

-64-

statement may also be inadmissible" under those rules.  They did not identify which statements were inadmissible, but instead suggested that the court itself should "go through" the tapes "line-by-line, making individual assessments as to each declarative statement."  Defendants stated that they would provide the court with a schedule identifying offending statements and detailing the bases for their exclusion.  They never provided this schedule.

At the April 16 hearing on the motion, defendants again focused on <u>Petrozziello</u> and the constitutional theories. Corrente's counsel acknowledged that the government had edited the tapes to deal with Rule 403 concerns.  Nothing more was said with regard to either 403 or 404.  The court denied the motion to suppress the Pannone statements and refused to undertake the line-by-line analysis, explaining that it "would take easily, . . . weeks . . . and it would delay the trial by that period of time." The court expressed its plan to "minimize the risk of a mistrial in the event that statements are presented that later are found not satisfy the requirements" by requiring the government to present "additional evidence above and beyond the statements themselves to support a finding that they qualify as admissible co-conspirator statements."

On April 24, the second day of trial, the government in-chambers mentioned that defendants had failed to propose cuts to the Pannone tapes.  In response to Corrente's counsel's suggestion

that the defense would later in the trial move to excise other taped statements pursuant to Rules 403 and 404, the court stated that such motions "should have been done long ago."

Throughout trial, the court repeated that proposals for cuts to the tapes had been due by April 12, 2002, pursuant to its Pre-trial Scheduling Order.  Upon challenges at trial by defendants to the admissibility of individual tapes, the court stated that they could not make these objections because they had failed to tender such an objection pre-trial.

Defendants argue that they complied with the pre-trial scheduling order because they timely filed "an objection identifying the recording to which objection is being made" as required by the Pre-trial Scheduling Order.  However, they fail to mention that the order also mandates that "[m]emoranda in support of objections . . . shall be accompanied by copies of the transcripts objected to on which proposed deletions and corrections are noted."  Defendants failed to provide the district court with these specific objections.  The supplemental schedule promised by defendants never materialized; the schedule, moreover, was not an "extra" offer, but explicitly required by the order as part of any objection to the tapes.  The district court declined to perform a line-by-line assessment of the transcripts because it had specifically provided in the order that the parties do it.  After repeated general objections non-compliant with the procedural

order, the court decided that the defendants waived their right to object pursuant to the order. It did not abuse its discretion in refusing to entertain piecemeal objections to evidence in the Pannone tapes.

Regardless, admission of the taped statements--which defendants still have failed to itemize--did not prejudice defendants. As we have explained supra, the government has produced sufficient evidence of the tapes' reliability and probative value. Moreover, the court followed through on its assurance that it would "minimize the risk" of improper admission by requiring the government to produce evidence corroborative of statements made in the tapes.

We stress that the court wisely recognized that stop-and-go evidentiary evaluations of these tapes during trial would unduly delay the case and perhaps even cause the very prejudice and confusion that defendants contemplated in their general objection. Accordingly, the court fashioned a system well before trial through which it expected both parties to whittle down the tapes to their relevant portions. See United States v. Nelson-Rodriguez, 319 F.3d 12, 34 (1st Cir. 2003) ("The trial court has wide discretion in determining admissibility under Rule 403 since the trial judge 'is more directly familiar than a court of appeals with the need for the evidence and its likely effect.") (citations omitted). An important part of this system was for defendants to produce

-67-

transcripts of the tapes denoting which portions they wished to redact out of Rule 403, Rule 404, constitutional, or <u>Petrozziello</u> concerns. Even in their appeal, defendants persist in the ambiguity of their objection to the tapes. Other circuits have not tolerated this type of objection. <u>See, e.g.</u>, <u>United States</u> v. <u>Holland</u>, 880 F.2d 1091, 1094-95 (9th Cir. 1989) (where some parts of audiotape were admissible but "much of the tape was irrelevant," the defendant's "blanket objection to the admission of the tape does not preserve an objection to failure to redact the tape"). We find no abuse in the district court's exercise of its broad discretion over Rule 403 and 404 considerations.

## V. Cianci's Taped Statement

### A. Hearsay

In 1995, a government agent posing as an air conditioning businessman taped his conversation with Cianci when he requested a city contract. Cianci assured the agent that he would refer him to Alan Sepe, who Cianci believed knew more about air conditioning matters than he did. Cianci then told the agent, "[Sepe] is honest as the day is long. He deals in governments and ____. No one will ask you for a thing. If anybody does, you pick up the phone and call me. I'll cut his ____ off and have him arrested, okay?" The agent had said or done nothing to prompt discussion of corruption. Then, Cianci, in introducing the agent to an unidentified man, remarked, "He's probably an FBI agent."

The district court refused to admit this tape on relevancy grounds, holding that the conversation in it "does not relate to any predicate act or to any specific matter with respect to which the Government has presented any evidence." In response to Cianci's argument that the statements were admissible under the "state of mind" exception to the hearsay rule, see Fed. R. Evid. 803(3), the court concluded, "This statement or the import of the statement is to show what Mr. Cianci did or didn't do on other occasions with respect to unrelated matters, so therefore it does not fall under the exception to the hearsay rule created by Rule 803(3) for state of mind existing at the time of the event in question." Cianci argues that the district court's refusal to admit this taped statement in evidence was an abuse of discretion and violated his right to due process. Colasanto v. Life Ins. Co. of North America, 100 F.3d 203, 213 (1st Cir. 1996).

The district court deemed Cianci's taped statement irrelevant because it did "not relate to any predicate act or to any specific matter with respect to which the Government has presented any evidence." Cianci argues that the court failed to recognize the statement's relevance to the RICO charges in general. He asserts that the statement tends to make the existence of the enterprise less likely than without the statement, Fed. R. Evid. 401, and that the court "conflat[ed] the provisions of Rule 803(3) . . . with the relevancy requirements of Rule 401."

Cianci recapitulates that if the statement in the tape is hearsay, it falls within the state of mind exception to the hearsay rule. Fed. R. Evid. 803(3). "To be admissible under this exception, a declaration, among other things, must 'mirror a state of mind, which, in light of all the circumstances, including proximity in time, is reasonably likely to have been the same condition existing at the material time.'" Colasanto, 100 F.3d at 212 (quoting 2 John W. Strong, McCormick on Evidence § 274 (4th ed. 1992)). Cianci contends that the statement evinces a contemporaneous intent not to endorse bribery in his administration, rather than a statement denying past instances of corrupt acts. In addition to adopting the district court's conclusion that the statement evinced a "state of mind" as to events or behavior on other occasions, the government argues that Cianci's statements were self-serving, and hence outside the ambit of Rule 803(3), because he knew that he was talking to a federal agent.

As an initial matter, the taped statement is hearsay. Cianci offered it to prove the truth of the assertion that Cianci did not tolerate corruption. Another thing is certain: the statement was not admissible in order to show what Cianci might have done or not done on other occasions not proximate to the time the statement was uttered. The only purpose for which the statement could have been admitted would have been to establish

Cianci's state of mind at the time the statement was made. Because "disputes over whether particular statements come within the state-of-mind exception are fact-sensitive, the trial court is in the best position to resolve them." Colasanto, 100 F.3d at 212. That the statement was made at one point during the time of charged conspiracy cannot be sufficient to mandate its admission, especially where the latter part of the statement--"He's probably an FBI agent"--places doubt on what Cianci claims is the probative value and relevance of the statement as a whole. Whether Cianci's statement is "forward-looking" or refers to past acts and events is unclear from the statement itself. Ths issue is further complicated by the fact that Cianci's mention of pay-offs was "gratuitous" and not provoked by anything the agent said or did. Hence, it was within the district court's discretion to conclude that the statement, at least in part, applied to past acts of the Cianci administration and were to a large extent "self-serving" attempts to cover tracks already made. Such observations are well-established grounds for non-admission. See, e.g., United States v. Bishop, 264 F.3d 535, 549 (5th Cir. 2001), cert. denied, 535 U.S. 1016 (2002); United States v. Miller, 874 F.2d 1255, 1265-66 (9th Cir. 1989); United States v. Jackson, 780 F.2d 1305, 1313-15 (7th Cir. 1986). Thus, as the district court determined that Cianci sought to admit the statement "to show that he did not and does not take bribes or engage in corrupt activity," we are loath

to disturb the court's exercise of discretion to deny admission of the statement.

B.  Due Process claim

Cianci claims that by denying admission of his taped statement, the district court violated his Fifth Amendment due process right to "a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 687 (1986).  We review this claim for plain error because it was not raised at trial. Under plain error review, the defendant must show (1) that an error occurred (2) which was "obvious" in the sense that governing law was clearly settled to the contrary, (3) affected the defendant's substantial rights, and (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.  United States v. Gomez, 255 F.3d 31, 37 (1st Cir. 2001).

Application of evidentiary rules "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' . . . [W]e have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused."  United States v. Scheffer, 523 U.S. 303, 308 (1998) (citing Rock v. Arkansas, 483 U.S. 44, 56 (1987)).  We have described the Supreme Court's rule as overturning convictions only in "egregious cases." Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001).  Cianci outlines his

"weighty interest" as his effort to disprove the government's theory of criminal intent. Even if we were to give some exculpatory value to the statement, given the amount of evidence of Cianci's criminal knowledge and intent presented at trial, its absence from the evidence does not rise to an "egregious" violation of Cianci's interest in defeating this part of the government's case. Arguably, the statement itself indicates that Cianci knew he was talking to an FBI agent. Regardless, the court acted well within its discretion in determining that Cianci's taped statement did not pass muster under Rule 401 and that its value, if any, fell outside of Rule 803(3)'s exception to the hearsay rule. Accordingly, we conclude that the court's refusal to admit his taped statement did not constitute error, let alone plain error, and thus, Cianci's due process claim fails.

## VI. Conclusion

Accordingly, defendants' convictions are affirmed.

## VII. Sentencing and Forfeiture Appeals

In light of the Supreme Court's recent decision in Blakely v. Washington, 124 S.Ct. 2531 (June 24, 2004), we do not decide the sentencing appeals raised by all defendants as well as challenges by defendants and the government to the district court's forfeiture order. By separate order, we have requested additional briefing and oral argument on these issues.

**Separate opinion, concurring in part and dissenting in part, follows.**

**HOWARD**, <u>Circuit Judge</u>, **concurring in part and dissenting in part.**  The majority has skillfully analyzed a number of very difficult issues, and I concur in parts II and III of its opinion, which affirm Corrente's and Autiello's non-RICO-related convictions.  As to the RICO-related convictions, I am not persuaded that the majority correctly disregards the jury's interrogatory answers in conducting its sufficiency review, <u>see</u> <u>ante</u> part I-E, or that it has convincingly fended off defendants' argument that a municipal entity, which is incapable of being found to have acted with an unlawful purpose, cannot coherently be regarded as a member of an associated-in-fact RICO enterprise that is defined by the shared unlawful purposes of its associates, <u>see</u> <u>ante</u> part I-B.  But even if I assume that the jury's interrogatory answers are irrelevant and that municipal entities can be named as associates of the type of RICO enterprise that was alleged in this case, I still must dissent from the majority's conclusion that there is sufficient record evidence to sustain defendants' RICO-related convictions.  In my view, the RICO-related judgments (including the forfeiture judgment) should be reversed and this matter should be remanded for resentencing.

The majority has done an excellent job of summarizing the relevant legal principles, the nature of the associated-in-fact RICO enterprise alleged in this case, and the pattern of racketeering activity underlying the RICO and RICO conspiracy

allegations.  See ante at 4-10 & 11-13.  I adopt this discussion by reference and turn to the particulars of the argument I find persuasive.

Defendants contest their RICO-related convictions, in part, on the ground that the evidence introduced at trial in support of the nine alleged schemes was inadequate to establish that the schemes were conducted through the amalgam of persons and entities alleged in the indictment to have constituted the RICO enterprise.  Defendants premise this argument on an underlying assertion that there was no proof to ground an inference of a shared purpose among defendants and all of the municipal entities named as associates of the enterprise -- a required finding (at least usually, see ante at 13) if an unlawful criminal association is to be regarded as a RICO enterprise.  Defendants say that their position is bolstered by two "findings" made by the district court and not contradicted by the government (or at least not clearly so): (1) "there is no evidence that the [City] departments and/or agencies, themselves, shared [the enterprise's] purposes," United States v. Cianci, 210 F. Supp. 2d 71, 73 (D. R.I. 2002), and (2) "none of [defendants'] acts . . . resulted in any significant disruption of a Governmental function."  Thus, the argument goes, even if we were to assess the adequacy of the evidence supporting the RICO convictions by looking at the whole record and construing it in favor of the government (despite the nine judgments of

acquittal entered by the district court and the special interrogatory answers collectively indicating that much of the government's RICO case was not "proven"), we would find only a few, relatively inconsequential interactions between the defendants and these municipal entities during the nearly eight years the enterprise was alleged to have existed.

The government's response tracks the grounds on which the district court rejected the defendants' motions for judgments of acquittal: (1) we should follow the Ninth Circuit and hold that "RICO does not require intentional or 'purposeful' behavior by corporations charged as members of an association-in-fact," United States v. Feldman, 853 F.2d 648, 657 (9th Cir. 1988); and (2) the jury's enterprise finding was sufficiently supported by evidence that Cianci and Corrente (Autiello, who was not a municipal employee, is not mentioned) "using the Office of the Mayor and the Office of Director of Administration as base camps, . . . controlled" the municipal entities named as enterprise associates. The government's first suggestion, that we reject defendants' argument on the basis of the Feldman principle, faces insurmountable obstacles. This court has identified the "common purpose" requirement discussed in United States v. Turkette, 452 U.S. 576, 580-83 (1981), as one of the principal tools a factfinder should use to distinguish a RICO enterprise from an ad hoc criminal confederation. See ante at 13; see also Ryan v. Clemente, 901 F.2d

177, 180 (1st Cir. 1990) (emphasizing that the common purpose requirement is necessary to "limit the potentially boundless scope of the word 'enterprise'" and thereby "distinguish culpable, from non-culpable, associations").[17]  Indeed, we have applied the requirement (albeit without acknowledging _Feldman_) in a case involving an unlawful purpose RICO association-in-fact involving corporate legal entities.  See _United States_ v. _London_, 66 F.3d 1227, 1243-45 (1st Cir. 1995).  Moreover, and decisively, the district court instructed the jury _without objection from the government_: "[I]t is not necessary in proving the existence of an enterprise to show that each member of the enterprise participated in or even knew of all of its activities, but it is necessary to show that all members of the alleged enterprise shared a common purpose."  The government has not attempted to reconcile _Feldman_ with _Turkette_, _Ryan_, _London_, or our other cases applying _Turkette_.  See _ante_ at 13.  Thus, as the majority concedes, we cannot disregard the common-purpose instruction in analyzing defendants' sufficiency challenges.  See ante at 18-19 (citing _United States_ v. _Zanghi_, 189 F.3d 71, 79-80 (1st Cir. 1999)).  The

---

[17]_Ryan_, which was authored by then-Judge Breyer, involved a civil RICO claim, but precedent generated in civil RICO cases applies to criminal RICO cases.  See _United States_ v. _Shifman_, 124 F.3d 31, 35 n.1 (1st Cir. 1997).

-77-

question whether <u>Feldman</u> correctly states the law must be left to another day.[18]

This leaves the government's undeveloped assertion -- an assertion that the majority finds convincing -- that the jury's enterprise finding is sustainable because there was evidence that Cianci and Corrente exercised "control" over the municipal entities named as members of the enterprise. Because the common-purpose instruction binds for purposes of our analysis, I shall assume that the government intends by this assertion to argue that such "control" is sufficient to impute to the entities the unlawful purposes of those alleged to control them -- i.e., Cianci and Corrente. <u>Compare</u> <u>London</u>, 66 F.3d at 1243-45 (involving closely held corporations operated by the defendant and alleged to be members of his unlawful associated-in-fact RICO enterprise); <u>United States</u> v. <u>Masters</u>, 924 F.2d 1362, 1366-67 (7th Cir. 1991) (involving a law firm and two police departments associated in fact with those who controlled or manipulated them). I also shall assume that it would be fair to sustain the defendants' convictions on evidence of such control, notwithstanding the absence of jury instructions explaining that a municipal entity's "purposes" may be

---

[18]Even under the <u>Feldman</u> approach, the court still would face the question whether entities not controlled by those accused of operating the alleged association-in-fact enterprise are properly considered part of such an enterprise. For the reasons that follow, I do not think that they are. Thus, my conclusion that the <u>Feldman</u> rule does not apply under the facts of this case is not outcome determinative.

so ascertained.  Even so, I do not see how the convictions can stand.

In my view, there is no proof that Cianci and Corrente so controlled the activities of all the municipal entities alleged to be associates of the charged enterprise that the two's shared criminal purposes are reasonably imputed to each such entity. There is no evidence that, for example, Cianci and Corrente themselves could provide those willing to pay bribes with jobs in City departments over which they lacked hiring authority; or that they could contractually bind City departments under separate leadership; or that they could sell City property; or that they could grant or deny construction variances.  Nor did the government show that the persons, committees, and boards within the municipal departments, offices, and agencies whose assistance the schemes required abdicated their decision-making responsibilities to Cianci or Corrente.[19]  In short, neither Cianci nor Corrente was shown to have so dominated the affairs of the departments, offices, and agencies claimed to be associated with the unlawful purpose enterprise that each of these municipal entities might fairly be found to have been an alter ego of Cianci or Corrente with respect

[19]This statement is subject to the following two qualifications.  First, the jury could have found that Corrente himself had the ability to dictate which towers were placed on the police department's tow list.  Second, the jury could have found that the Board of Tax Assessment Review was effectively controlled by Cianci and Corrente through the corrupt machinations of RICO co-conspirators Joseph Pannone (BTAR's Chairman) and David Ead (BTAR's Vice-Chairman).

to the transactions in question.[20]  Rather, the evidence showed only

that Cianci and Corrente periodically used the power inherent in

---

   [20]By this statement, I do not mean to imply that those municipal actors to whom Cianci and Corrente directed their successful requests and demands (compare infra note 5) always acted within standard operating procedures or even lawfully.  To the contrary, as the majority explains it:

> [T]he evidence depicted a behavioral spectrum ranging from innocent cooperation to willful complicity in unlawful conduct.  For example, with respect to the Freitas Invoices scheme, the evidence was merely that an employee within the City's Finance Department (Lorraine Lisi), acting at Corrente's request, paid valid invoices more promptly than usual.  Similarly, with respect to the Ise Job scheme, the evidence was merely that the Deputy Director of the Department of Planning and Development (Thomas Deller) created a temporary position for Ise within the department at Cianci's request.  At the more culpable end of the spectrum, however, there was evidence that, in connection with the Jere Lease scheme, the head of the Department of Public Property (Alan Sepe) and the Director of Business Relations for the School Department (Mark Dunham) were influenced by Corrente to tailor the specifications in a School Department lease bid to fit the dimensions of Jere Realty's building, and then to support the Jere Realty lease before the Board of Contract and Supply (which was the entity formally empowered to accept or reject bids of City contracts).  Similarly, in connection with the Freitas Lease scheme, there was evidence that Corrente again contacted Dunham prior to finalization of the lease and influenced him to drop consideration of an alternative lease.

Ante at 20 n.3.  But importantly, even in connection with these latter two schemes, Sepe and Dunham were not shown to have known of and willingly joined the alleged RICO enterprise conspiracy.  Nor was there a basis for finding that a majority of the Board of Contract and Supply, the entity which ultimately voted to accept the Jere Realty lease, did so for purposes of furthering the alleged RICO enterprise conspiracy, or even with knowledge that it was ratifying a contract that had been formed in disregard of standard operating procedures.

their positions to influence (or attempt to influence)[21] the decisions of other municipal actors -- actors who, with the exceptions noted in the preceding footnote, were not shown to be privy to, let alone supportive of, the alleged enterprise's purposes.

The question arises why this evidence of influence is not sufficient to make the persons and entities influenced part of the alleged enterprise. The answer, I believe, lies in the fact that we are here deciding what is required for membership in an associated-in-fact RICO enterprise <u>defined only by the common</u>

---

[21]The majority acknowledges that Cianci and Corrente "did not always get their way . . . ." <u>Ante</u> at 24. As the majority notes, there was uncontradicted evidence that, in connection with the Freitas Lots scheme, Cianci was displeased that elements within the Providence Redevelopment Agency, the entity empowered to sell the lots, did not sufficiently accede to his wishes. <u>See</u> <u>id.</u> n.7. There also was uncontradicted evidence that, in connection with the University Club scheme, Cianci was angered when members of the Providence Building Board of Review ignored his wishes and granted the club some of the variances that it sought. <u>See</u> <u>id.</u> Finally, there was uncontradicted evidence that, in connection with the Maggiacomo Job scheme, the Chief of Police declined to admit Maggiacomo to the police academy because he had a criminal history and had been untruthful during a screening interview. <u>See</u> <u>id.</u>

The majority suggests that this evidence "does not defeat the integrity of the charged enterprise" because the jury could have concluded that "these glitches in the schemes only meant that certain substantive crimes went uncompleted . . . ." <u>Id.</u> With respect, I think that the evidence is more telling on the point in question -- whether there was sufficient evidence that Cianci and Corrente so controlled the Providence Redevelopment Agency, the Providence Building Board of Review, and the Department of Public Safety that their unlawful purposes should be imputed to these entities -- than the majority acknowledges. There was, after all (and as the majority concedes, <u>see</u> <u>ante</u> at 17), no other evidence from which the jury might have found that defendants controlled these agencies (or at least relevantly so).

unlawful purposes of its members.  This is a highly ramified decision with implications, criminal and civil, that extend far beyond this case.  Were we to permit a person or entity to be named part of an unlawful purpose enterprise on mere evidence that the person or entity acceded to a mobster's request (but without knowledge of the purposes underlying the request), we would be heading down the slippery slope against which then-Judge Breyer warned in Ryan: that of failing to differentiate between associations that fall within the sweep of RICO and associations involving only the exploitation of others by criminals.  See 901 F.2d at 180-81 (emphasizing the need to limit "the potentially boundless scope of the word 'enterprise' so as to distinguish culpable from non-culpable associations," and recognizing "the serious consequences for any man or woman, state official or private person, who is publicly accused of racketeering"); see also Fitzgerald v. Chrysler Corp., 116 F.3d 225, 226-28 (7th Cir. 1997).[22]  As Ryan suggests, membership in an unlawful purpose RICO

_____

[22]To illustrate, suppose there was evidence that a young law school graduate made a $5,000 "campaign contribution" to Cianci and asked for a recommendation to the hiring partner of a Providence law firm that does a substantial amount of city business.  Suppose further that there was evidence that Cianci called the firm's hiring partner and asked that the firm give serious consideration to hiring the young lawyer.  If the firm did so, would it become a member of the common purpose enterprise alleged in this case?  If the answer is "no" (as I think it clearly should be), on what principled basis can we find that the Department of Planning and Development -- the agency that created a temporary position for Christopher Ise at the request of Cianci -- was proved to be part of the enterprise?

enterprise implies potential culpability under the RICO statute. See 901 F.2d at 181; see also 18 U.S.C. § 1962(d) (allowing for the imposition of RICO liability under conspiracy principles). Thus, as a matter of logic (not to mention due process), one who lacks the mental state necessary for the imposition of RICO liability because he is unaware of the enterprise or its purposes also lacks the mental state necessary to be part of a RICO enterprise that is defined solely by the shared, culpable mental state of its members. This is ultimately what, in my view, dooms the government's enterprise allegations in this case.

There was in this case significant evidence of public corruption. Perhaps the government could have proved that Cianci and Corrente ran the Office of the Mayor or the Office of the Director of Administration as a RICO enterprise. Or perhaps the defendants (or, more likely, a subset thereof) might have been shown to be members of one or more smaller, associated-in-fact RICO enterprises. But the government successfully persuaded the grand jury to cast a wider net and to allege that the persons named as enterprise associates, along with the campaign contribution fund, the City of Providence, and many of its departments, offices and agencies, functioned as a de facto organized crime syndicate. Framing the case in this way permitted the government to allege that defendants were responsible under RICO's conspiracy provision for all of the illegal and unethical conduct put on display in this

trial -- even that in which they were not shown to have personally participated.[23]  But this broad case theory obligated the government to prove that each municipal entity alleged to have engaged in conduct that constituted part of the "pattern of racketeering activity" identified in the indictment was itself a member of the enterprise.  As another court has put it:

> [I]t must be stressed that the government, through its ability to craft indictments, is the master of the scope of the charged RICO conspiracy . . . . [RICO's conspiracy provision] is capable of providing for the linkage in one proceeding of a number of otherwise distinct crimes and/or conspiracies through the concept of enterprise conspiracy. The government, through the vehicle of the indictment, provides the linking conspiratorial objective of a specific RICO violation.  The "specific" violation can be broad or narrow.  It is the prosecution which sets the parameters to which a RICO conspiracy trial must be confined; having set the stage, the government must be satisfied with the limits of its own creation.

United States v. Weissman, 899 F.2d 1111, 1115 (11th Cir. 1990) (quoting United States v. Neapolitan, 791 F.2d 489, 501 (7th Cir. 1986)) (internal quotation marks omitted; emphasis in original).

---

[23]For example, Autiello was responsible under RICO for the unlawful conduct underlying the Freitas Lease and Freitas Invoice schemes -- schemes on which the jury returned substantive convictions but in which he was not involved -- on the theory that he was a member of a conspiracy to conduct the enterprise that carried out these schemes.

RICO is a powerful weapon that can cause mischief if abused by an overzealous prosecutor.[24] While I do not doubt that RICO will sometimes apply in cases of political corruption, I fear the consequences of making the statute too easy to invoke -- or too easy to apply broadly -- in the political context, where persons who have made a contribution to a politician routinely receive favorable treatment from offices or agencies over which the politician has influence. I therefore agree with Justice Breyer that we must place comprehensible limits on RICO's reach and that an important way of cabining the statute is to require true culpability before one may be named part of an associated-in-fact RICO enterprise defined by the common unlawful purposes of its constituents. See Ryan, 901 F.2d at 180-81. Such a limitation helps to ensure that cases involving claims of political corruption will not also inevitably give rise to a RICO charge, and that cases involving multiple acts of common law fraud will not also inevitably give rise to civil liability under the statute.

In this case, the government proved only that many of the municipal entities named in the indictment were used as tools by defendants. For reasons I have explained, this is not enough to prove that these entities were part of a RICO enterprise defined

_____

[24]I am speaking generally here and in no way intend to impugn those who brought this case. Indeed, there is no reason to doubt that the government's enterprise allegations were made in a good faith attempt to comply with circuit precedent in this tricky area of the law.

only by the shared unlawful goals of its members.  Thus, the government failed to prove the existence of the enterprise alleged in connection with the RICO counts, and the RICO convictions cannot stand.  See United States v. Morales, 185 F.3d 74, 80-82 (2d Cir. 1999) (reversing on sufficiency grounds where the proof failed as to the specific enterprise charged in the indictment); Weissman, 899 F.2d at 1113-15 (vacating a conviction obtained after the trial court constructively amended the indictment in a supplemental jury instruction by permitting the jury to find a different enterprise than that charged in the indictment).

I respectfully dissent from part I of the majority opinion and would not reach the issues addressed in parts IV-VI (which are rendered immaterial by my conclusion that the defendants' RICO-related convictions must be reversed).